## Briceland *versus* The Commonwealth.

74        463
22 SC  ⁴272

1. A jury on a trial for murder was charged and retired on the last day of the term; and not agreeing the court was adjourned from day to day for three days beyond the end of the term, when a verdict of guilty was rendered. *Held*, that the jurisdiction of the court did not end with the term.

2. The Act of April 14th 1834 enables the judges to hold jury trials at any time between terms by precept, as they were formerly accustomed to do.

3. This includes the power to adjourn from day to day, which needs no precept in a case already begun, if necessity require.

4. When a defence is *alibi*, the proof must cover the time when the offence was committed, so as to preclude the possibility of the prisoner's presence at the place of the crime.

5. The prisoner's failure to prove an *alibi* when set up by him, does not relieve the Commonwealth from proving that he committed the crime.

6. Mills *v.* Commonwealth, 1 Harris 627; Williams *v.* Commonwealth, 5 Casey 102, remarked on.

November 20th 1873. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Oyer and Terminer of *Washington county:* No. 73, to October and November Term 1873.

Henry Briceland was indicted and tried for murder at the February Term of the Court of Oyer and Terminer of Washington county, on the 17th day of February 1873, before Acheson, P. J., and both his associates.

The February Term of the court ended on Saturday, March 1st.

The leading facts as to the murder were these: About midnight of the 4th of December 1872, John Allingham, living in Eldersville, Washington county, was killed whilst in bed and asleep in his own dwelling-house. His death was caused by the discharge of a piece of iron water-pipe, loaded with powder and slugs, placed on the top rail of the porch and the window-sill, near the head of his bed, and fired by a fuse communicating with the pipe. The prisoner was arrested next day on the charge of having committed the murder.

The evidence, as is usual in such cases, was circumstantial, and was made up of the testimony of very many witnesses. The questions decided by the Supreme Court will require no other statement of it but that relating to the defence of *alibi*, as contained in part of the charge of Judge Acheson.

The prisoner gave evidence for the purpose of showing that he was at the house of a man named Chap. Truax at the time the murder was committed. This house was about two and a quarter miles from the residence of the deceased.

Mrs. Truax testified that on the night of the murder the prisoner came to their house and went to bed shortly after nine o'clock, in a room adjoining her chamber, into which there was a door from the prisoner's room, which was not closed. "I waked about one

[Briceland *v.* Commonwealth.]

o'clock, and saw Briceland's coat on the chair, and heard him snore and grit his teeth." Prisoner was waked in the morning by her husband about five and a half o'clock, and came into the kitchen and ate his breakfast before six o'clock.

Chap. Truax, the husband, testified substantially as his wife had done.

On the question of *alibi* the court charged :—

"We will now turn your attention to an important ground of defence. The prisoner relies upon evidence in the nature of an *alibi ;* that is to say, that he was at another place at the time the crime was committed. This is a defence which, when satisfactorily made out, necessarily overturns the strongest circumstantial evidence, and it is sometimes the only available defence to an innocent man. But in every case where the defence of *alibi* is resorted to, it should be very closely scrutinized, for the reason so forcibly expressed by an eminent judge : 'It is a defence often attempted by contrivance, subornation or perjury. The proof, therefore, offered to sustain it is to be subjected to a rigid scrutiny; because, without attempting to contest or rebut the evidence of facts sustaining the charge, it attempts to prove affirmatively another fact wholly inconsistent with it; and this defence is equally available, if satisfactorily established, to avoid the force of positive as of circumstantial evidence. In the conflict of evidence, whatever tends to support the one tends in the same degree to rebut and overthrow the other, and it is for the jury to decide where the truth lies.' The prisoner having undertaken to prove that he could not have been present when the murder was committed, or the means were used to effect it, your attention is directed to the time at which the witnesses for the defence testify they saw the prisoner, and to the particular circumstances they detail. Keeping in mind, then, the other proofs in the case showing the hour of the night when the murder took place, let us proceed to consider the evidence on which the defence relies to show the absence of the prisoner from the fatal spot."

After reading to the jury the evidence of Mr. and Mrs. Truax, the court said :—

"Admitting the testimony of Chap. Truax and his wife to be true, and making allowance for any variation of time which the evidence would warrant, had the prisoner still the opportunity of making his preparations and being at Eldersville at midnight of Wednesday, the 4th of December ? The proof is that he was at Eldersville from Friday until Tuesday morning before the murder, at the house of Ruth Howard. When he left or under what circumstances does not appear, nor is there anything in the testimony, so far as we recollect, to prove his first arrival at the station on Tuesday, the day before the murder. He was back in the neighborhood on that day and at the station, as well as on Wednesday.

[Briceland v. Commonwealth.]

He accounts for his time on the afternoon of that day from three to four o'clock P. M. till nine o'clock at night, when he went to bed at Truax's. From nine P. M. to one o'clock A. M. of Thursday, a period of about four hours, his time is not accounted for. Could he within this time have gone to Eldersville, committed the deed and returned to the Truax house? The distance by the road is about two miles and a quarter; Mr. Gardner says two miles by the most direct route, pursuing that indicated by the tracks through the fields, coming out on the Steubenville road near the locust tree, and that the divergence to and from that tree would be about four rods.

"The concurring evidence is that the explosion took place about twelve o'clock. Mrs. Noah says the clock struck twelve just after she heard it, and immediately before she heard a person running down the Steubenville road, which would be in the direction of the station. This would make about an interval of three hours from the time the prisoner went to bed at Truax's, and allow about an hour's interval between the explosion and the time when Mrs. Truax awoke and roused her husband for the purpose of putting coal on the fire. Would this afford a sufficient time for the prisoner's return from Eldersville, supposing he were the person Mrs. Noah heard running down the road about the time the clock struck twelve? It is for you to determine how far this evidence is in conflict with the other testimony in the case. Does it cover the time so as to preclude the possibility of the prisoner's presence at the place of the murder? The burden is on the prisoner to make it out to your satisfaction; but his failure so to do does not relieve the Commonwealth from the duty of proving that he was the perpetrator of the crime."

In concluding the charge the court said:—

"You will consider all the circumstances proven to your satisfaction which point to the prisoner as the guilty agent, and say whether they all concur to show that he committed the crime, and are inconsistent with any other rational conclusion.

"The prisoner's guilt must be made out by evidence sufficiently conclusive to exclude any reasonable supposition of innocence. Upon the whole case, and every material part of it, you are to give him the benefit of any reasonable doubt arising out of the evidence. If the evidence convinces your understanding and satisfies your reason and judgment, you can safely act upon it. A doubt such as the law recognises is not a mere speculation whether a matter established to your satisfaction may not be otherwise. It must fairly arise out of the evidence, and not be merely fancied or conjured up to escape the consequences of an unpleasant verdict. [It must be an honest doubt—such a difficulty as fairly strikes a conscientious mind and clouds the judgment. If the mind be fairly satisfied of a fact on the evidence, as much so as would induce a

24 P. F. Smith—30

[Briceland *v.* Commonwealth.]

man of reasonable firmness and judgment to take the fact as true and act upon it in a matter of importance to himself, it would be sufficient to rest a verdict upon it.]

"We have thus endeavored to explain to you the law and bring before you the evidence on both sides. If we have omitted anything material, you must ascribe it to inadvertence, and you will recall it in your searching examination of the whole case. Allowing the prisoner the benefit of the presumption of innocence and of every rational doubt, you will give the evidence your calm, deliberate and solemn consideration. If you should reach the conclusion that the prisoner caused the death of John Allingham, by the means and in the manner proven by the Commonwealth, he would be guilty of murder of the first degree; but, as we have explained, it devolves upon you, as a jury, in case of conviction, to ascertain in your verdict the degree of the crime. We now commit the case to your hands. Be governed entirely by the law and the evidence, and follow your own conscientious convictions. Let nothing turn you aside from your sworn duty to yourselves, the Commonwealth and the prisoner, and may an infinitely-wise God preside over your deliberations and guide you to a just conclusion."

The jury retired at seven o'clock P. M. on Saturday, March 1st, the last day of the February Term; the court informing them that the court would meet at any time that night or on Sunday, to take their verdict, if they should have agreed; the court then adjourned to meet upon the ringing of the court-house bell, at any time before twelve o'clock or on Sunday; otherwise to meet on Monday at nine A. M. On Monday March 3d, the court met at nine o'clock A. M. The jury came into court and announced that they were unable to agree, and asked to be discharged. The request was declined by the court, the court was adjourned and met at ten A. M., when the jury again came in and asked further instruction, which being given, they retired. On March 4th the jury came in and rendered a verdict that the prisoner was "Guilty of murder in the first degree."

A motion was made for a new trial which, after argument, was overruled and on the 4th of April 1873, the prisoner was sentenced to be hanged.

The prisoner removed the record to the Supreme Court, and there assigned twenty-one errors.

The second was the charge of the court on the question of *alibi*.

The twenty-first was that the court erred in entering judgment on the verdict.

*Crumrine & Patterson* (with whom was *G. O. Jones*), for plaintiff in error.—The evidence referred to in the charge as designed to prove an *alibi*, was to prove such exculpatory circumstances as would, when weighed, with the circumstances against him,

[Briceland v. Commonwealth.]

produce a reasonable doubt of his guilt. The court therefore erred in putting upon him the burden of establishing a specific defence. As long as the criminal agency is in doubt, the burden is on the Commonwealth: Commonwealth v. Drum, 8 P. F. Smith 9; Burrill on Circumstantial Evidence 49 and notes; 1 Bishop Crim. Procedure 534 and notes; Cathcart v. Commonwealth, 1 Wright 108.

Under the 21st assignment, the counsel discussed the question of the power of the Court of Oyer and Terminer to adjourn beyond the term. Regular terms of Oyer and Terminer were unknown until Act of April 14th 1834, sect. 58, Pamph. L. 532. Previously to that act they were held only by special precepts for that purpose, first from the judges of the Supreme Court under the Act of May 12th 1722, and afterwards by the judges of the Common Pleas, under the Constitution of 1790 and the Act of April 13th 1791. The power to hold adjourned Courts of Quarter Sessions cannot be drawn from the power to hold adjourned Courts of Common Pleas under the Act of 1806: Mills v. Commonwealth, 1 Harris 627. Adjourned sessions are not fixed by law but are called from time to time by the judges to meet emergencies. The terms are times fixed by law for holding courts: Horton v. Miller, 2 Wright 270; Kroemer v. Commonwealth, 3 Binney 577. The Acts of Assembly limit the terms in Washington county to two weeks. They referred at large to Act of April 14th 1834, *supra*.

*T. H. Baird*, District Attorney, for the Comonwealth.—Evidence of *alibi* should be heard with great caution: Foster's Crim. L. 368, and should be such as to cover the whole time or as least so much as to render the commission of the act by the prisoner impossible: and if the time is not exactly fixed and the place not far off, it becomes one of probabilities: Wills on Circumstantial Ev. 167, 139. The burden is on the prisoner: Commonwealth v. Fife, 5 Casey 429. On the 21st assignment he referred to and discussed the Act of 1834 and Williams v. Commonwealth, 5 Casey 102.

The opinion of the court was delivered, January 5th 1874, by
AGNEW, J.—The only serious error alleged in this record is the continuation of the trial of the prisoner after the expiration of the regular term of the Court of Oyer and Terminer. The jury received their charge on Saturday, the last day of the term, and being unable to agree, did not deliver their verdict until the following Tuesday. It is argued, that, though the trial was continued without intermission from the 18th of February, and the testimony closed only Saturday the 1st of March, the end of the term should have ended the trial without a verdict. If this be so, an extraordinary *casus omissus* has existed from the foundation of the state, for doubtless many murder trials have outlasted the fixed terms of the courts, which in many counties have been for a single

[Briceland *v.* Commonwealth.]

week.   The argument rests on the want of an express statute to prolong the term, in such a case of necessity, and on the fact that such a provision exists in reference to the Quarter Sessions : Act 14th April 1834, § 49.   But the organization and powers of these courts do not stand on a precisely similar footing; and the argument from analogy has no real bearing.   The organization and powers of the Quarter Sessions were discussed by Justice Coulter in Mills *v.* Commonwealth, 1 Harris 627.   I shall not refer to them myself.   So far as that case is cited as authority for this, I need only say it has no relevancy, the trial there having been *commenced* as well as finished at an adjourned court, contrary to the terms of the Act of 14th April 1834, § 51, forbidding the transaction of business requiring the intervention of a grand or petit jury.   This has been remedied by the Act of 22d April 1850.

Before the Act of 1834 the Oyer and Terminer was not held at fixed periods, but only when the business required, and the only authority for fixing the time was a precept under the hands and private seals of the judges.   Emergencies may arise, says C. J. Tilghman, requiring such courts to be held on a sudden.   These points are all determined in White *v.* The Commonwealth, 6 Binney 184–5, and were recognised by the Commissioners of Revision in their report upon the Act of 14th April 1834, 2 Park & Johns. Dig. 797.   They therefore provided that the Courts of Oyer and Terminer should be held statedly at the several times appointed for holding the Courts of Quarter Sessions, although no special precept shall have been issued for that purpose : § 58.   The power of the judges to issue special precepts for Courts of Oyer and Terminer, to be held from time to time, as emergencies might require, was continued, "in the manner hitherto practised and allowed in this Commonwealth :" § 59.   This power enables the judges to hold jury trials at any time between terms, by precepts, as they were formerly accustomed to do.   It is clearly a greater power than that of adjournment from day to day, which needs no precept to continue that which is already lawfully begun, and includes the inferior power to continue from day to day when required by the necessity of the case.   *Omne majus continet in se minus.*   This acquires greater force from the express power conferred on all the courts in the sixty-third section : " In case of the non-attendance of a competent number of judges to hold any of the courts aforesaid, at the day and place appointed by law for holding the same, also in case of the subsequent interruption of any court by the sickness, death or absence of any of the said judges, *or by any other cause,* any judge shall have power to adjourn the court from day to day until a quorum be present, or *otherwise,* as he shall deem expedient."   If one judge has this power of continuance in a case of emergency, it is certainly quite as reasonable that *all* the judges should have

[Briceland v. Commonwealth.]

power to continue from day to day when a case of necessity out-lasts the term. These inferences arise naturally from the acknow-ledged powers of the judges of the Oyer and Terminer. The power to continue has the authority of analogous cases. Thus in Williams v. Commonwealth, 5 Casey 102, where a prisoner was tried at the stated term, it was held that he was lawfully sentenced to death at an adjourned court. In that case the adjournment was on the simple order of adjournment and not by precept. In effect the order of adjournment in open court is a precept; and this case is stronger, for here the adjournment was from one day to the next; while there the adjournment was over to a distant day; and the power to continue in trial is more warranted than to adjourn to a distant day to sentence. Necessity also is a just ground of con-tinuance: Clark v. Commonwealth, 5 Casey 129; McCreary v. Commonwealth, Id. 323. In the latter case it was said the con-stitutional provision that no one shall be put twice in jeopardy "is not so inexorable as to shut out a practical construction demanded by necessity and the safety of the community." In Common-wealth v. Jailer of Allegheny County, 7 Watts 366, it was also said that there is no doubt that necessity, either moral or physical, may raise an available exception to the letter of the Habeas Cor-pus Act; and see Commonwealth v. Sheriff, 16 S. & R. 304, and Ex parte Walton, 2 Whart. 501. The decision in the Election Cases, 15 P. F. Smith 34, is also in point. There by the act the contest is to be determined at the next term; but it was held that the expiration of the term while the case was in progress did not strike down the jurisdiction of the court.

We are of opinion, therefore, that the jurisdiction of the Court of Oyer and Terminer in the case before us did not end with the term, but continued by the adjournment from day to day until the trial closed and the verdict was delivered, and, if necessary, sen-tence passed.

Complaint is made of that portion of the charge relating to the defence of *alibi*, but without just ground. When a defence rests on proof of an *alibi*, it must cover the time when the offence is shown to have been committed, so as to preclude the possibility of the prisoner's presence at the place of the murder. Although the prisoner makes no admission of guilt by setting up an *alibi*, yet clearly the value of the defence consists in its showing that he was absent from the place where the deed was done, at the very time the evidence of the Commonwealth tends to fix its commission upon him; for if it be possible that he could have been at both places, the proof of the *alibi* is valueless. The court treated the evidence of the prisoner's being in bed at Truax's as an *alibi* defence, which in truth it was; and in this view the portion of the charge com-plained of was correct. It is argued now that, though the prisoner's evidence of an *alibi* was not conclusive as to time, yet it tended to

[Briceland *v.* Commonwealth.]

raise a doubt of his presence at the house of John Allingham. But the court said nothing to the contrary; and when charging on the *alibi* as a defence, said expressly that the prisoner's failure to prove it did not relieve the Commonwealth from the duty of proving that he was the perpetrator of the crime. At the close of the charge, when speaking of the doubt which should avail the prisoner, the judge said: "The prisoner's guilt must be made out by evidence sufficiently conclusive to exclude any reasonable supposition of innocence. Upon the *whole case and every material part* of it, you are to give him the benefit of any reasonable doubt arising out of the evidence." And again: "Allowing the prisoner the benefit of the presumption of innocence and of *every rational doubt*, you will give the evidence your calm, deliberate and solemn consideration." These were nearly the closing words of the charge, leaving the last and most vivid impression upon the minds of the jurors. The excellent judge who presided at the trial did the prisoner full justice.

The remaining assignments need no notice, not possessing sufficient merit to reverse the judgment.

The sentence of the Court of Oyer and Terminer is therefore affirmed, and the record ordered to be remitted to the court below for execution according to law.