## PEOPLE *v.* CAREY.

1. CRIMINAL LAW—IDENTIFICATION—PHOTOGRAPHS.

   Where the evidence indicated a change of appearance of accused between the time of his arrest and trial, in that at the trial he wore glasses, which he declined to remove at the request of the people's counsel, a photograph taken of him at the time of his arrest became competent to aid in his identification with the person alleged to have committed the crime.

2. SAME.

   The photograph being admissible, it was competent for witnesses to testify whether it looked like the person seen committing the crime.

3. SAME—LARCENY—INSTRUCTIONS—MATTERS NOT INVOLVED.

   Where, on a prosecution for the larceny of certain cattle, the evidence showed conclusively that the cattle were stolen, and the jury were so instructed, and there was also testimony tending to show that respondent was seen in possession of the stolen property, which he denied *in toto*, it was not error for the court to omit instructions as to the essential elements of the crime of larceny, and as to any theory of the innocence of such claimed possession.

4. SAME—COMMENTS ON TESTIMONY.

   That the court called the jury's attention to the testimony of the only witness who positively connected respondent with the possession of stolen property, and intimated that, if true, it showed him in the possession of the property at a time and under circumstances raising a strong presumption of guilt, was not an improper discussion of the testimony, where the court at the same time explained the rule which made the jurors the judges of its truth and accuracy.

5. SAME—READING EVIDENCE TO JURY—ABSENCE OF RESPONDENT.

   Where, on a prosecution for larceny, the jury, after retiring, returned into court in respondent's absence, and asked to have the testimony of one of the people's witnesses read to them, which was done after respondent's counsel had stated, in answer to a question, that he was not particular about the respondent's being present, no error was committed.

Error to Lapeer; Smith, J. Submitted November 15, 1900. Decided January 29, 1901.

James Carey was convicted of larceny, and sentenced to imprisonment for five years in the State prison at Jackson. Affirmed.

*James A. Muir*, for appellant.

*Horace M. Oren*, Attorney General, and *I. J. Kohler*, Prosecuting Attorney, for the people.

HOOKER, J. The defendant was convicted of the offense of larceny of some cattle, which the evidence shows to have disappeared from their owner's field, and later to have been butchered in Port Huron, with the exception of one, which was found upon the premises of

the father of an alleged *particeps criminis* of the defendant, who had, previous to the trial in this case, been convicted of the same offense that the defendant was subsequently convicted of. No witness was produced who saw the cattle taken from the field, but several testified to meeting two men driving some cattle about the time, and the record contains evidence of identification of the cattle sufficient to warrant a jury in concluding that they were the cattle alleged to have been stolen. One witness (Laidlaw) identified the defendant and William Davis as the men driving said cattle, and testified that he had known them 10 years, and that he talked with them upon this occasion, and was told that they intended to take them to their farm; *i. e.*, the farm of John Davis. This is the farm where the steer was afterwards found. The other witnesses were unable to identify the defendant, and a photograph was produced by the prosecution, and they were asked if they had seen it before. They stated that they had seen it in the hands of the sheriff soon after the alleged larceny, and had identified it as closely resembling one of the men seen by them driving the cattle. One of these witnesses (Spencer) testified as follows upon this subject:

"*Q.* Have you seen a picture since that which resembles either of the men?

"*A.* I have.

"*Q.* Without turning them over on the back, will you look at these pictures, and see whether or not there is a picture there that resembles either of the men? (Objected to as incompetent and immaterial.)

"*The Court:* The simple statement of resemblance would not be material, but he can give his best judgment and belief as to whether it was one of the men. (Exception for defendant.)

"*Q.* Look at this, and see if you can pick out one of them there that is the picture of the man, in your best judgment.

"*Mr. Loughnane:* I object to that. What would that prove?

"*The Court:* Standing alone it would not be much,

but I assume it is preliminary to something else. (Exception for defendant.)

"*A.* There is a picture there that looks like the man, marked 'Exhibit X.' I saw this picture soon after the 10th,—some time after.

"*Q.* I will ask you whether or not a couple of men were arrested near your place of residence with stolen cattle?

"*The Court:* Answer that yes or no.

"*A.* I don't know.

"*Q.* Did you hear of a couple of men being arrested? (Objected to as incompetent.)

"*The Court:* Take it. (Exception for defendant.)

"*The Court:* Answer yes or no.

"*Q.* Some time after that, three or four months, in August or September?

"*A.* I did. It was shortly after their arrest that this picture was shown to me. I could not tell whether there were more pictures than one or not.

"*Q.* At that time you picked out the man as being with the cattle?

"*A.* I thought it was; I could not tell; I could not say whether or not he had glasses on that time.

"*Mr. Kohler* (to defendant): Will you take off your glasses and stand up?

"*Mr. Loughnane:* I object to that as incompetent and immaterial.

"*The Court:* He is not obliged to do that, Mr. Kohler.

"*A.* I have never seen the defendant before except on the day of examination. I don't think that he very much resembles the man that I met. I could not describe the man that I saw with reference to his beard."

Mr. Brown testified:

"I saw the defendant on the 7th of January. He don't look like the man that I saw on the 5th day of July driving these cattle. That man had a mustache, and he looked darker complexion. He did not wear glasses those times.

"*Mr. Kohler:* Remove your glasses, please (addressing the defendant).

"*Mr. Loughnane:* I object to that.

"*The Court:* I don't think I can compel him to do that.

"*Q.* What do you say, in your judgment, as to his resembling or being the man you saw there?

"*A.* I should think he resembled the man some, but I

would not say so positively. Sheriff Myers showed me those pictures. I didn't look at any of the pictures except on the face, I think. I saw the pictures twice, one side of this.

"*Q.* Is that the picture you picked out resembling the man, or was that it?

"*A.* Yes, that is about the way I saw it. It is the same picture I picked out each time."

The photographer identified the defendant as the original ₁ of the picture. The sheriff was then sworn, who testified that:

"I reside in Mt. Clemens, and lived there in 1897, and was sheriff of Macomb county at that time. I recognize this defendant as James Carey. He was in my custody while I was sheriff.

"*Q.* How did he come to be in your custody?

"*A.* I was notified on the 6th of August, 1897, by telephone, that Mr. Hesner's cattle were stolen in the township of Bruce, and I sent a deputy on the trail, and he went to Almont, I think, and saw Mr. Myers, a deputy, at that time, under Demorest, a sheriff here. They had one man, and wanted to arrest the other, and wanted me to come up there; and I took the train to Romeo, and a livery rig to Almont, and when I got to Almont—

"*Mr. Loughnane:* I object to this. I don't see what this has got to do with it.

"*Q.* Just state whether or not you took him into custody.

"*Mr. Loughnane:* Object to that.

"*The Court:* Take it. (Exception for defendant.)

"*A.* Yes, I did.

"*The Court:* Where?

"*A.* At Almont. There were two men.

"*Q.* And what was his name?

"*Mr. Loughnane:* I object to it. I don't see how it has anything to do with this.

"*Mr. Kohler:* I am trying to connect that picture. I expect to show that he had this picture taken of him while he was in his custody.

"*The Court:* It may stand. (Exception for defendant.)

"*A.* This picture was taken on August 7, 1897, by A. C. Novice. It is the picture of James Carey, the defendant here. At the time I got him at Almont, he was not in the habit of wearing glasses, or did not wear them.

"*Q.* How long was he in your custody in the jail at Mt. Clemens?

"*A.* From the 7th of August until September term of court. I took him to Jackson myself, he and his partner.

"*Mr. Loughnane:* I object to that, and move to strike it out.

"*The Court:* It may be stricken out.

"*A.* At that time he complained of rheumatism, and was slightly lame. He was lame part of the time.

"*Q.* That was a correct picture of Carey, the defendant here, at the time he was in your care? (Objected to as leading.)

"*The Court:* Take the answer, yes or no.

"*A.* Yes, sir. (Exception for defendant.)"

The photograph was introduced in evidence. It is claimed that the photograph was not admissible, and that this was an identification of the defendant by secondary evidence, not permissible; also that it was resorted to for the purpose of informing the jury of defendant's arrest, conviction, and imprisonment for stealing other cattle soon after the loss of the cattle in question in this case. There is some evidence in the record indicating a change in appearance of the defendant, especially in regard to wearing glasses, which he declined to remove at the request of the people's counsel, which made the introduction of the photograph competent, if it would not otherwise have been,—a question that we prefer to reserve. Being competent, the testimony relating to it was proper; and, while it was not competent to show that the defendant had stolen other cattle, that testimony was volunteered, and was immediately stricken out by the court.

Error is alleged upon the charge, which, it is said, failed to explain to the jury the essential elements of larceny, and leave to them the question " whether the cattle were stolen." The testimony is all contained in the record, and warranted the court in advising the jury that the cattle were stolen. Hence there was no occasion for defining larceny. Again, there was nothing in the case indicating a claim that defendant, if in the possession or control of the cattle, was innocently so. He denied it *in*

*toto*. If this denial was false, there was nothing in the case which would give rise to an inference of innocence. It was unnecessary to incumber the charge with questions which there was no occasion for the jury to consider.

But one more question needs consideration. Laidlaw was the only witness who unqualifiedly identified the defendant as one of the men driving the cattle. The court called attention to the testimony, and intimated that, if true, it showed defendant in possession of the cattle at a time and under circumstances raising a strong presumption of guilt. At the same time he explained the rule which made the jurors the judges of its truth and accuracy. Complaint is made of this, but we think the judge kept well within the proper rule in discussing this testimony. After the jury had retired, they returned into court with the request that Laidlaw's testimony might be read to them. Defendant was not present, but his counsel was, and, upon being asked whether he desired the presence of the defendant, replied that he was not particular, and the testimony was read in defendant's absence. It is now contended that this was error. We think the point is within the principle of *People* v. *La Munion*, 64 Mich. 715 (31 N. W. 593).

We have examined the remaining assignments of error, and think it unnecessary to discuss them.

The judgment is affirmed.

The other Justices concurred.