Commonwealth *v.* Duca, Appellant.

Argued March 20, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Charles J. Margiotti,* with him *S. C. Pugliese, John E. Evans, Sr.,* and *Frank L. Pinola,* for appellant.

*John H. Dando,* Assistant District Attorney, with him *Thomas M. Lewis,* District Attorney, and *J. Harold Flannery,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, April 10, 1933:

This is an appeal from the judgment and sentence of the Court of Oyer and Terminer of Luzerne County on Peter M. Duca, who was convicted of the murder of Alex Campbell. The verdict was murder of the first degree and the penalty fixed was imprisonment for life.

At about 5:10 P. M. on February 28, 1928, Peter Reilly and Alex Campbell were driving a sedan eastwardly along Railroad Street in the City of Pittston. Three men in another automobile (hereinafter referred to as the "murder car") followed them, crowded their sedan to the curb, and fired a fusillade of shots at them, killing both men. The firearms used included two automatic shotguns loaded with buckshot and two revolvers. The assailants fled then in the direction of Scranton, their progress being blocked at Moosic by a freight train. They thereupon abandoned their car. One witness who was shown a photograph of Duca taken apparently some years before the trial, identified him from this photograph as the man he saw walking away from the car. Two other witnesses said that the photograph resembled the man who was seen walking away from the car. A pedestrian noted the license number of the car and re-

ported the same to the police. On the day following the homicide the defendant Duca fled to New York with one Ralph Melissari; then later Duca went alone to Dallas, Texas; Trinidad, Denver, and Colorado Springs, Colorado; California, and Honolulu. At the latter place he was apprehended and was then returned to Luzerne County.

The defendant came to Scranton from Dallas, Texas, in 1927. A little later he brought his family to Scranton, but on February 15, 1928, he sent his family away and went to Portchester, New York, for Melissari with whom he returned to Scranton. The two men shared sleeping quarters and were frequently seen together in and about Scranton, until the day after the shooting, when both fled to New York. Melissari was apprehended in New Orleans and returned to Luzerne County where he was tried and convicted. He was sentenced to imprisonment for life. On February 24, 1928, the defendant contracted for the purchase of the murder car and also another automobile (hereinafter referred to as "car B"). The license plates of the latter were transferred at the direction of Duca to the former car, and were subsequently found near the point where the car was abandoned in Moosic. The number on these plates was that reported to the police by the pedestrian who noticed it as it was driven rapidly toward Scranton after the shooting of Campbell and Reilly. It was admitted by the defendant that immediately prior to the shooting he went to New York, where he purchased a quantity of ammunition, six shotguns and revolvers, and then returned to Scranton, where with Melissari he registered at a hotel.

Upon his arrest defendant made a written statement in which he averred that he had come to Scranton at the behest of one Joe Gallo; that he had been engaged while there in the construction and operation of alcohol stills; that he had delayed his departure in order to collect money due him from Gallo and others in connections

with the stills; that these men who had not the money to pay for his work on the stills were nevertheless the same ones who provided him with the funds required for the purchase of the automobiles and firearms above referred to; that another of these financial backers was one Joe DeLucca; that he, defendant, fled from Scranton after the shooting because he read in a newspaper that the number on the license plates of the murder car corresponded with the number on car B which he was known to have purchased and used, and that because of this he "didn't feel so good."

Defendant while making Scranton his habitat and in the course of his subsequent journeys used numerous aliases, among them being the names of Joe Gallo and Joe DeLucca. On the register of one hotel appeared the handwriting of defendant in the purported signatures of "Joe Gallo," "Joe DeLucca," and "Joe DeCarlo."

The assignments of error may be grouped as follows: (1) Prejudice arising from the exclusion of the names of women from the jury wheel. (2) Prejudice arising from the fact that witnesses for the State who were unable to identify defendant in open court were permitted to make their identification by the use of certain photographs. (3) Prejudice arising from incidents which occurred during direct and cross-examination of witnesses. (4) Prejudice arising from the comments, charge and refusals to charge of the trial judge.

As to the first assignment, the exclusion of women from the jury: there was testimony to the effect that women were consistently so excluded in Luzerne County because that county had never provided suitable accommodations for them. It has repeatedly been held in this and other states that a man cannot claim impairment of his constitutional rights in the exclusion of women jurors at his trial: Com. v. Zell & Herr, 81 Pa. Superior Ct. 145; Com. v. Garletts, 81 Pa. Superior Ct. 271; McKinney v. State, 3 Wyoming 719; State v. James, 114 A. 553. In the Garletts case, supra, the court said: "The

action of the officers who filled the jury wheel with the names of members of the sex of the appellant did not deprive him of the equal protection of the laws, guaranteed by the Fourteenth Amendment of the Constitution of the United States. The right guaranteed by that constitutional provision only inures to the benefit of a defendant who is a member of the race or class discriminated against, the race or class which is denied the equal protection of the law. It has been held that a man has no standing to complain that his constitutional rights have been violated when women were improperly deprived of their right to serve as jurors."

The second group of assignments of error is based on the identification of defendant by means of three photographs after the witnesses had failed to identify defendant at the trial. These witnesses had never seen defendant before the day of the homicide and then had only a fleeting glimpse of him. More than four years had elapsed since that fleeting glimpse and during that time defendant had been a hunted man, presumably under mental stress and strain, and it is reasonable to believe that these years had left their indelible marks upon his countenance, altering somewhat his former appearance. Under these circumstances there was no error in the court's permitting the witnesses to make their identification from the photographs which were the State's exhibits 46, 47 and 46-a. Exhibit 46 was a "Rogues' Gallery" photograph which defendant admitted to be a likeness of himself. Exhibit 47 was an enlarged reproduction of 46, from which the prison number and criminal record had been deleted. Exhibit 46-a was another reproduction minus the number and record of 46. It was the same size as the original but of a slightly different color. Exhibit 46 was excluded from the jury's view, as the presence of the number and record thereon might be prejudicial to defendant, but the witnesses were permitted to make their identification therefrom.

It is an established rule that where there has been a change in the appearance of a defendant, witnesses may identify him from photographs. While this rule has been followed in cases where the alteration in the subject's appearance has resulted from the addition of a mustache, beard, or eye-glasses, there is no principle of law or logic that makes this rule inapplicable here. See Com. v. Connors, 156 Pa. 147, 27 A. 366; Com. v. Luccitti, 295 Pa. 190, 145 A. 85, and People v. Carey, 84 N. W. 1087 (Michigan).

The identity of a defendant with that of a person seen several years previously fleeing from the locus of a crime shortly after its commission, being the fact in issue, and a photograph of the defendant taken at a time not remote from the date of the crime charged being in evidence, a witness's identification of the fleeing man with the subject of the photograph is clearly relevant. In law as in mathematics "things equal to the same thing are equal to each other." "The rules of evidence are founded on good reason and common sense": Justices YEATES and SMITH in Galbreath v. Eischelberger, 3 Yeates 515. "The law furnishes no test of relevancy. For this it tacitly refers to logic and general experience": Professor Thayer in "Preliminary Treatise on Evidence at the Common Law" (page 265).

As to the prejudice arising from incidents which occurred during the trial: the first of these was the sustaining by the trial judge of the district attorney's objections to testimony sought to be introduced by the defense with reference to defendant's alleged activities in the sale of a "still" on the ground that such testimony was incompetent, irrelevant and immaterial. The legal purpose of this testimony was to attempt to prove the actuality of the existence of one Joe Gallo as a person other than the defendant himself. The State had already proved that the defendant had registered at a hotel as "Joe Gallo," and had been known by one of his associates by that name, and had listed that name as one of

his many aliases in the voluntary written statement immediately after his arrest. The only testimony which the court excluded was that bearing on the financial aspects of defendant's "bootlegging" activities. The court did permit the defense to prove these activities as an attempted explanation of the defendant's presence in Scranton, and of the purchase of the guns, ammunition and cars. The defense wished the jury to infer that Duca's armament was required by the hazards of his vocation.

The second incident complained of arose when a defense witness on cross-examination testified that she had never been interviewed by anyone concerning the crime. A police officer who was a Commonwealth witness stood up and holding aloft four extended fingers, exclaimed, "Four times." This act was complained of by the defense counsel in the presence and hearing of the jury, although the record indicates that neither the court nor the district attorney saw or heard it. While the act complained of was disorderly, it cannot be said to have prejudiced the defendant because this police officer was shortly afterward called to the stand by the State, in rebuttal, and testified in due form that he had interviewed this witness. The legal effect of this testimony was to discredit the woman witness called by the defense. The Commonwealth had a right to do this and it was, despite the disorder referred to, done in the proper way.

The third incident complained of had its origin as follows: a witness for the defense, on cross-examination and in reply to a question by the district attorney, as to whether he knew that Melissari had been tried four years before, volunteered the information that he did not "know what he was condemned for." It is claimed that this amounted to a breach on the part of the Commonwealth of the rule against showing prior conviction of the defendant's accomplice. Since the district attorney did not attempt to elicit the volunteered information and

since the defense had prior to this statement frequently brought out, on cross-examination of witnesses, the fact that Melissari had been charged with and twice tried for the same crime in the same court, the incident complained of cannot be regarded as so improper and prejudicial as to call for a reversal.

This is the fourth incident complained of: Mrs. Bessie Miller testified in a manner which the Commonwealth claims was a departure from her previous statements concerning the crime and trial of Melissari, this departure being toward the interest of the defendant. Later in cross-examining a defense witness, the district attorney stressed the fact that the witness then on the stand had been subpœnaed by the husband of Mrs. Miller, but gave expression to no inference that the favorable testimony of Mrs. Miller had been induced by the employment of her husband as a process server by the defense. Defendant's counsel then stated: "......It is highly improper to throw out insinuations against Mr. Miller or any other person, who served subpœnas, unless the Commonwealth proposes to show that there was some improper conduct. We have a right to subpœna witnesses. ...... Now what is wrong about this?" The district attorney replied: "You have hundreds of constables, rather than to get the husband of our witness."

The significance, if any, of the fact that Mrs. Miller's husband had been employed by the defense to subpœna witnesses was impressed upon the jury by the defendant's counsel rather than by the district attorney, and he therefore cannot complain of it.

The following is another incident alleged to be prejudicial to the defendant: A county detective, Jack Dempsey, was being cross-examined by defendant's counsel. He was asked these questions and made these answers: Q. "You are very much interested, aren't you? A. Not at all, other than that justice be done." Q. "Didn't you tell me today at noon you would like to

press the button and send this man to the electric chair? A. I am satisfied he is guilty and I would do it."

While the remark of the county detective was improper, the defendant's counsel obviously invited it and cannot justly complain that his invitation was accepted. The court immediately afterward instructed the jury as follows: "Pay no attention to that remark at all. Disregard it."

The last group of errors assigned seek to find their sustenance in the "omissions" and "commissions" of the charge and in a certain comment of the trial judge. The comment complained of was that of the court to defendant's counsel when the latter, during his address to the jury, said: "Defendant has not taken the witness stand. Under the law of Pennsylvania defendant has—" Here the court interrupted counsel, saying, "Go on, remember my warning to you. You will take the risk and responsibility. Go on." It appears that the trial judge just before this, at the time when defendant's counsel first mentioned the fact that defendant had failed to take the stand, called counsel to the side-bar and said that the practice was "dangerous" and that it "might open an argument on the same subject by the Commonwealth." The trial judge in his apprehension that defendant's counsel might tempt the Commonwealth's counsel to say something which would impinge on the mandate of the Act of May 23, 1887, section 10, P. L. 157, 161, against *adverse* reference by court or counsel to the defendant's not taking the witness stand possibly went further than was necessary in his monitory remarks, but he did not restrict in the slightest degree the right of defendant's counsel to say to the jury that the refusal of a defendant on trial to offer himself as a witness creates no presumption against him. The first and last words of the judicial remarks complained of were: "Go on."

The chief complaint about the trial judge's charge is as to that portion of it which discussed the subject of an alibi. Appellant, after summarizing the charge of the

court, says: "It will be seen......that the court simply told the jury that the defendant must prove his defense to the satisfaction of the jury, but that he was not obliged to prove it to the jury beyond a reasonable doubt. It was incumbent upon the court to go further and state that the burden was upon the defendant to satisfy the jury of his defense simply by a preponderance of the evidence." Appellant argues that the jury was erroneously instructed, and to defendant's prejudice, because the court did not submit to the jury a formula of proof of alibi by *preponderance of evidence* instead of by proof *satisfactory to the jury.* This is a distinction which perhaps only psychologists and philologists can comprehend, and, as we said in Herb v. Hallowell, 304 Pa. 128, 135, 154 A. 582, "It is a matter of observation that few philologists get on juries." We expressed in that case doubt of the wisdom of trial judges attempting to lead juries "into mazes of subtlety and casuistry where the mind of the average juror could not follow them." Wigmore in his second edition of Evidence, volume 5, page 470, section 2497, aptly says: "The truth is that no one has yet invented or discovered a mode of measurement for the intensity of human belief. Hence there can be yet no successful method of communicating intelligibly to a jury a sound method of self-analysis for one's belief. If this truth be appreciated, courts will cease to treat any particular form of words as necessary or decisive in the law for that purpose; for the law cannot expect to do what logic and psychology have not yet done." Professor William Trickett in "Preponderance of Evidence, and Reasonable Doubt" (The Forum, Dickinson School of Law, X, 76), also aptly says: "There is no measure of the weight of evidence (unless the witnesses on the evidential facts are counted) other than the *feeling of probability* which it engenders."

In Com. v. Barrish, 297 Pa. 160, 146 A. 553, this court approved of the following instructions as to an alibi: " 'Where a person sets up an alibi as a defense, the bur-

den of proving his alibi to the satisfaction of the jury is thrown upon him. If he does not do this, his defense of alibi falls completely.' " And this court there said in an opinion by Mr. Justice KEPHART: "Evidence that reasonably satisfies or reasonably preponderates is sufficient. To permit evidence of an alibi to be considered by the jury without some instruction as to its probative value or the degree of persuasion necessary before it attains any value, would introduce a false note in the case, as it would permit the jury to adopt their own idea of its worth; they would have no standard to determine its effect. All evidence should have some degree of probative force." To the same effect is Com. v. Szachewicz, 303 Pa. 410, 154 A. 483. In Rudy v. Com., 128 Pa. 500, 18 A. 344, this court said: "The burden of proving it [the alibi] was clearly on the prisoner. If he failed to do so to the satisfaction of the jury, the alleged alibi, as a substantive defense, was valueless." The emphasis should there be placed on "substantive."

Complaint is also made of the following excerpt from the instructions of the trial judge: "But an alibi is as much a denial of the crime charged as any other defense, and the proof tending to establish it, though not clear, may, with the other facts in the case, raise a reasonable doubt of the guilt of the accused, and, as I said to you, that doubt belongs to the defendant." While it is true that an acquitting reasonable doubt may arise from the proof offered in support of the alibi pleaded, without reference to any other evidence in the case, we do not think the instruction quoted led the jury away from the fundamental proposition which so clearly appears throughout the entire charge that defendant was entitled to the benefit of *any* reasonable doubt arising from the evidence. For example, the trial judge said in his instructions: "If......such hesitancy still persists after considering the evidence *from all angles,* that is what the law terms a reasonable doubt, and if you have such a doubt in this case the defendant is entitled to the benefit

of it. .. .. .. The doubt may arise out of the evidence *on an isolated point,* but essential to the Commonwealth's case, or out of the whole body of the evidence."

The charge of the court considered in its entirety correctly defined the duty resting on the defendant to meet the burden he assumed when he offered the defense of an alibi. At the same time the charge was in harmony with the established doctrine that where the effect of the evidence in support of the alibi is to create in the minds of the jury a reasonable doubt of the defendant's guilt, the latter is as much entitled to an acquittal on account of the reasonable doubt thus generated as he would on account of a reasonable doubt generated by any other competent evidence in the record. When the evidence is in, "the final question remains, Are the essential averments of the indictment proved beyond a reasonable doubt? If this question cannot be answered affirmatively, the accused is entitled to an acquittal, without regard to the manner in which such doubt was raised, whether by evidence or lack of evidence or any other factor in the case": Wharton's Criminal Evidence, 10th ed., volume 1, page 674, section 333; Turner v. Com., 86 Pa. 54, 74.

Complaint is also made that the trial judge refused many of the twenty-eight requests for instructions submitted by defendant's counsel. The court's reasons for some of these refusals were that their subject-matter was already covered in the general charge; as to others that they were argumentative. These reasons were adequate and well founded. The duty of charging a jury is imposed by the Commonwealth not upon counsel but upon judges. The practice of counsel filing requests so numerous as to cover, with many verbal variants, practically all of the legal principles involved in a case should be discouraged by trial judges as an attempted usurpation of their functions. When a trial judge instructs the jury in an intelligible manner, stating all of the principles of law that need be considered by the jury before rendering a verdict in the case committed to their

keeping and applies these principles to the evidence in such a way that the jurors clearly understand the issues which they are to decide and are enabled by these instructions, if honestly and sensibly considered by them, to reach a just conclusion, counsel have no cause for complaint.

After reading the entire record in this case, we deem it appropriate to say here, as Mr. Justice AGNEW said in the case of Briceland v. Com., 74 Pa. 463, 470: "The excellent judge who presided at the trial did the prisoner full justice."

All the assignments of error are overruled and the judgment of the court below is affirmed; the record to be remitted so that the sentence may be carried out.