## Commonwealth v. Conjalko

**62**

*Gary Hartman, District Attorney,* for Commonwealth.

*Kenneth Lee Rotz,* for defendant.

SPICER, *P.J.*, March 14, 1980—Defendant has filed post verdict motions after having been found guilty by a jury of the crime of arson. He raises five issues in these motions. Two of these issues relate to pretrial matters and the remaining three relate to proceedings at trial.

Prior to the commencement of the trial defendant moved to suppress certain evidence which was obtained as a result of a search and seizure. After a hearing and argument, the court by order dated July 2, 1979, dismissed the application and ruled that the evidence obtained was admissible. At trial, the Commonwealth did not introduce any of the evidence which was a subject of the order. Therefore, this is not grounds to set aside the verdict; but we nonetheless reaffirm the prior holding and incorporate the opinion dated July 2, 1979, in this opinion by reference.

The Commonwealth moved for an extension of the time in which the trial could commence under Pa.R.Crim.P. 1100. The application was timely filed and defendant also timely filed a motion to dismiss the proceedings for violation of Rule 1100 prior to the commencement of the trial.

The complaint in this case was filed on March 11, 1979. The application for an extension was filed June 15, 1979. The application was on a printed form and alleged that the Commonwealth despite due diligence could not commence trial within the prescribed period for the reason that "the trial list

for the current term is such that the case cannot be scheduled." The application requested that the time in which the case could be brought to trial be extended through the entire trial term which began September 17, 1979.

In arguing that the Commonwealth was not entitled to an extension defendant cites Com. v. Antonuccio, 257 Pa. Superior Ct. 535, 390 A. 2d 1366 (1978). He does so because it is his position that the Commonwealth merely filed a form application which the Superior Court has ruled is fatally defective. It is true that in Antonuccio, supra, a conviction was reversed and a defendant was discharged and one of the reasons given was that the Commonwealth had filed a form petition which the court said was fatally defective. However, it was not the fact that the petition was printed that caused it to be fatally defective but because it alleged no reason why the Commonwealth could not proceed to trial. The petition in that case merely recited that the Commonwealth despite the exercise of due diligence could not bring the case to trial within the prescribed period of time. Further, no hearing was held on the application in Antonuccio.

The petition in the case before this court alleged judicial delay and that fact in and of itself is enough to distinguish it from the Antonuccio case. Furthermore, evidentiary hearings were held on our case.

The first hearing was held August 6, 1979, at which time the Commonwealth produced evidence that all trial terms held before September 17, 1979, were fully scheduled with cases having run dates either preceding or the same as this case.

A review of the transcript of that hearing indicates that the hearing was conducted in a rather informal manner at the court's suggestion to

minimize the time spent. See Com. v. Jackson, filed in Pa. Superior Court on September 7, 1979. Counsel were directed to minimize the factual issues and to hold an evidentiary hearing only on those issues which were subject to question or dispute. When the Commonwealth had produced the evidence showing the run dates of cases tried prior to this one, the court ruled that the Commonwealth was entitled to the extension. Defendant at the hearing and again in his post verdict motions maintains that this was error because the Commonwealth did not show due diligence.

In reviewing this decision the court sua sponte ordered a further evidentiary hearing which was held on February 6, 1980. Defendant objected to the court's order and objected to holding the hearing and has argued in a supplemental brief that the court was not empowered to order this hearing.

While there is some confusion about the propriety of further evidentiary hearings after a decision has been made to grant an extension, the court is satisfied that it acted properly. The Commonwealth did not produce evidence at the first hearing because the court ruled without giving it an opportunity to present evidence. Therefore, a second hearing is proper: Com. v. Groarke, _____ Pa. Superior Ct. _____, 409 A. 2d 870 (1979).

In reviewing the propriety of the court order granting an extension, we follow the holding in Com. v. Mayfield, 469 Pa. 214, 364 A. 2d 1345 (1976), which states that an extension because of judicial delay can be granted only after a showing of (1) due diligence of the Commonwealth and (2) certification that trial is scheduled for the earliest date consistent with the court's business.

If judicial delay is the basis for the request for an extension there must be some showing that it was,

in fact, a lack of courtrooms or judges which caused the delay and not the lack of readiness of the Commonwealth to proceed: Com. v. Shelton, 469 Pa. 8, 364 A. 2d 694 (1976); Com. v. Keith, _____ Pa. Superior Ct. _____, 408 A. 2d 880 (1979).

The trial calendar in Adams County for 1979 scheduled jury trials monthly except for the months of July, August, and December. With the exception of the session in September, all trial terms were one week in duration. There was an unsuccessful attempt to procure a visiting judge in June so that two courtrooms could be used but none were available during the week that trials were scheduled. Therefore, there was only one judge available during the trial term in June.

The trial schedule for the month of June was filled with other cases. At the hearing on August 6, 1979, the Commonwealth showed that all of these cases had earlier or the same run date as the case now before us. At the later hearing, the Commonwealth showed that it was prepared to go to trial at least 30 days prior to this case's run date. Defendant, however, argues that a letter sent to him by the Commonwealth pursuant to Pa.R.Crim.P. 305 showed that the Commonwealth was not in fact ready for trial.

The letter has been made part of the record by stipulation and the court has considered it. The letter basically corrected some information which the Commonwealth had provided defendant earlier. The letter was dated September 4, 1979. In reviewing its contents and the testimony at the second hearing we are convinced that the Commonwealth was ready to proceed to trial and that the delay in bringing defendant was caused by the lack of judicial facilities. Therefore, we reaffirm our prior holding that the Commonwealth was entitled

to an extension of time under Pa.R.Crim.P. 1100.

Turning our attention to the issues raised as a result of the trial, we note that the Commonwealth introduced evidence showing that a fire occurred at what it known as Dorsey Stanton Legion which is situate at 141 West High Street, Gettysburg, Pa. This occurred around 9:00 p.m. on March 10, 1979.

Earlier that day defendant told Cathy Hartman that he was "going to visit the Legion that night." The witness described defendant as being edgy and nervous. The conversation occurred at 58 Breckenridge Street in Gettysburg, which is close to the scene of the fire.

Later, defendant returned to 58 Breckenridge Street where there was a gathering of people. Around 8:40 or 8:45 p.m. he said that he was going to leave for a few minutes. He left and was next observed at a gas station at around 8:50 p.m. where he purchased 60 cents worth of gas. The gas was placed in a jug that defendant was carrying.

Shortly before 9:00 p.m. defendant was seen sitting in his green Volkswagon which was parked outside the Legion. Several people on the sidewalk were talking. One of these people, Elton Shelton, Jr., entered the Legion, which caters mainly to non-caucasians. Mr. Shelton testified that he noticed nothing abnormal and went up to the second floor where the bar is located. Other persons who had been on the sidewalk went their respective ways.

Shortly thereafter, Randolph Harris entered the Legion and saw a big fire "back in the corner." He said that he smelled smoke and gasoline. He ran next door to the home of a Gettysburg Borough Policeman, Roosevelt Sistrunk. Officer Sistrunk ran to the Legion, opened the door, saw the smoke, then ran back to his house and summoned the fire

department. At the time Mr. Harris entered the Legion and all times thereafter defendant was not observed at or near the scene.

Mr. Shelton testified that he smelled smoke some five to seven minutes after he had entered the building.

Various witnesses present at the gathering at 58 Breckenridge Street testified that defendant returned about a half hour after he left. He was described as appearing very nervous. One witness, Beverly Kane, described what happened as follows:

"When he returned he seemed very nervous and he was walking around the apartment or the room we were in. He walked over to the stereo and turned the volume down and looked at the five of us sitting there and said, 'None of you saw me leave this room tonight, did you? If anybody should ask I haven't left the room all night . . .'

"Well, he came back and sat down and he said something to the effect that we would be hearing fire engines shortly. After that he said, 'Listen, there are fire engines.' Someone turned the volume down on the stereo and there were fire engines or sirens outside. He continued something to the effect of what do you want to bet I know where the fire is. It's down on High Street. What do you want to bet? Then he continued by saying it's down at the legion. Then he told us that he had moved his car and in the process of moving his car he drove by High Street and saw someone setting a fire. He couldn't tell us who because if he did he would be in big trouble and the person might come after him but that he saw someone set a fire at the Legion on High Street."

Trooper James Boyle, a member of the Fire Marshall's Office of the Pennsylvania State Police, tes-

tified that he investigated the fire after it had occurred and some nine days after the fire shoveled away the debris on the first floor hallway and dug up portions of the floor. He placed this material in containers and delivered them to other policemen who ultimately delivered the material to a criminologist, Harry Fox.

Mr. Fox testified over objection as to the findings that he made after examining the charred material.* Defendant's objection was that there was no showing that the material was in the same condition when dug out by Officer Boyle as it was on the night of the fire because of the nine day delay. However, there was testimony that the building had been padlocked during the nine day interim by the owner and the description by the officers of the methods of obtaining the material remained unimpaired: Com. v. Rick, 244 Pa. Superior Ct. 33, 366 A. 2d 302 (1976). Thus, we hold that the objection which is the basis for post verdict motions was properly overruled.

Following the completion of the Commonwealth's case, defendant demurred. The court reviewed the testimony at the time of this demurrer and concluded that there was sufficient evidence to sustain a verdict of guilty and therefore overruled the demurrer. In reviewing the testimony once again we see no reason to change this decision. The evidence was circumstantial and, except for defendant's statement that he saw someone else set the fire, was all consistent with guilt. The jury had a right to disregard this part of the statement especially in light of the testimony that a door would have prevented defendant from seeing a fire being

---

*Gasoline was found. Officer Boyle testified the fire was incendiary in nature and an accelerant was used.

set and the testimony of Officer Boyle that the point of origin of the fire was in the rear of the hallway.

Defendant provided no evidence (and therefore has preserved his right to argue the demurrer). Following the overruling of the demurrer by the court the defense counsel proceeded to oral argument. It was at this time that an incident occurred which is the basis for the last issue raised. As the record will indicate, the court, while engrossed in the preparation of its final instructions, looked up and saw Trooper Kufta of the Pennsylvania State Police making pantomime laughter during defense counsel's argument. However, the jury's attention seemed to have been focused on defense counsel and the court did not consider the behavior flagrant enough to warrant action.

After the jury returned with its verdict the chief tipstaff reported to the court that he had also observed the officer making gestures. The court then conversed in chambers and a record was produced. The actions were described as occurring in the early part of the argument and having occurred two or three times. The chief tipstaff said that he had pointed his finger at the offending officer and that the behavior had ceased. Of course, since defense counsel did not know of the conduct, no requests were made for curative instructions and none were given.

None of the court personnel were able to say whether the officer's conduct had been observed by the jury. Therefore, the court on its initiative addressed inquiries to the members of the jury. These and the responses elicited therefrom have been made a part of this record.

The court is well aware of such cases as Com. v. Pierce, 453 Pa. 319, 309 A. 2d 371 (1973), but feels that the inquiries were properly made. Two mem-

bers responded that they had seen the officer's conduct. One described the conduct as follows: He made different eye and mouth gestures to the jury. He would look at the jurors, make eye contact, then smile and shake his head. He would lean back in his chair and make deep sighs while looking at the jury.

The other juror described the conduct as follows: When the defense attorney mentioned a point, the cop would look at the judge, and if the judge was not looking, he would shake his head. This, also, occurred when the D.A. made his spiel except the cop would violently nod when the D.A. mentioned a point.

The general law in this area is set forth in 75 Am. Jur. 2d, Trial §40. When conduct is not reprehensible as necessarily resulting in influencing the jury and does not influence the jury, the conduct is not grounds for a new trial, especially when the court has taken immediate steps to prevent the minds of the jury from being prejudiced. It has also been stated at sections 40 and 41:

"Where the misconduct is calculated to influence the jury in a criminal trial, and it appears that prejudice resulted, a new trial will be granted or judgment reversed, even though there is a failure to interpose objection to the misconduct, or to except to the action or lack of action of the court in respect thereto and the jury declares that it was not influenced. Indeed, it has been held that a judgment will be reversed because of such misconduct, even where there are grave doubts as to whether the jury was influenced." And further: "But, judgment will be reversed where a spectator makes a direct and manifest attempt to influence the jury in its verdict, it being sufficient, according to some authorities, to

require a new trial or reversal, that the mind of a juror might have been influenced."

Generally speaking, when the conduct in question has been observed by the court, the court is free to evaluate it and to take such steps as it deems appropriate: Com. v. Duca, 312 Pa. 101, 165 Atl. 825 (1933); State v. Craft, 85 Ariz. 143, 333 P. 2d 728 (Ariz. 1958). In the Duca case, conduct of a policeman during the interrogation of another witness was said to have been cured by that policeman's taking the stand and testifying. In Craft, the conduct of a spectator who, during the defense counsel's argument muttered "He killed my baby, he killed my baby." was cured when argument was interrupted and the offending person escorted from the courtroom.

However, in cases in which the conduct becomes so gross as to not be susceptible of cure, convictions have been reversed: Com. v. Hoover, 227 Pa. 116, 75 Atl. 1023 (1910). The same is true when the conduct has not been observed by the court and no curative action is taken: Com. v. Sojourner, _____ Pa. Superior Ct. _____, 408 A. 2d 1100 (1978). It has been held that in this instance the court is unable to evaluate the conduct and if the conduct is apparently designed to influence the jury then the conviction must be set aside.

The court does not believe the conduct which it observed would be grounds for new trial as was stated at the proceedings held in chambers. However, the court is unable to evaluate the conduct that occurred when the court did not observe it. Apparently, even the chief tipstaff missed portions of the conduct, because one communication from a juror indicated that it continued throughout argument.

The real problem that this type of conduct presents is that it might suggest to the jury that the officer personally felt that defendant is guilty because of information not available to the jury. Sometimes the prejudice caused by such an impression can be cured. In Duca, supra, an officer making gestures of disagreement while another testified was cured when the officer took the stand and testified. The basis for the disagreement was placed in full view for the jury's evaluation and the officer became just another witness with his credibility to be determined by the jury. We had, unfortunately, no opportunity to cure the effect of the conduct in this case.

We reluctantly order a new trial in this case, notwithstanding the fact that the District Attorney very carefully presented a case free from error and was scrupulously fair during his presentation of the case. The conduct of the officer is such that, not being in a position to evaluate it, we must remove any suspicion that it influenced the verdict in this case.

Accordingly, the following order will be entered.

## ORDER

And now, March 14, 1980, the motion for a new trial is granted.