Maglin *v.* Peoples City Bank, Appellant, et al.

Argued April 25, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER, RHODES and HIRT, JJ.

*Ralph J. McAllister,* with him *Paul W. McAllister,* of *McAllister & McAllister,* for appellant.

*Harry Shapera,* for appellee.

OPINION BY STADTFELD, J., July 20, 1940:

This is an action of trespass for damages caused to the plaintiff because of the collapse of a board in the floor of a dressing room of the bathhouse of a swimming pool on July 21, 1935. On May 26, 1932, the Peoples City Bank purchased Rainbow Gardens consisting of a swimming pool, bathhouse, etc., at sheriff's sale. On May 29, 1933, the bank leased the property to Arthur V. Bostrom for a term ending March 31, 1934. The bank claimed that it spent in the neighborhood of $4,600 to repair the property in 1933, and that on April 2, 1934, the property was in good shape. On April 2, 1934, the bank sold Rainbow Gardens to Arthur V. Bostrom by a written agreement of sale for $35,000 payable in yearly installments of $1,000 each until October 1, 1938, when the entire balance was to be paid. Under the agreement, Bostrom was to keep the premises in repair at his own expense. Bostrom immediately took possession under the agreement and operated the pool until April 14, 1939 and all the receipts from the operation of the resort went to Bostrom during this period. Bostrom did not default in his payments under the terms of the agreement until after July 21, 1935, the date of the accident. Bostrom defaulted in the terms of the agreement October 1, 1935 and was continuously in default thereafter. During the 1935 season the water supply, which was obtained from wells, diminished and there was not enough water to operate the pool efficiently, thus affecting the profits from the business. This condition continued during the 1936 and 1937 seasons

and in March, 1938, the bank drilled a well on the property but did not find water. Between the close of the fifth season and the formal repossession of the property by the bank on April 14, 1939, the bank granted a, right of way to a gas company for a pipe line over the property.

The case was tried before MUSMANNO, J., and a jury. A verdict of $500 was rendered Ethel Maglin, administratrix of the estate of Harry Maglin; a verdict of $500 was rendered Ethel Maglin, personally, against the Peoples City Bank; and a verdict was rendered for defendant, Arthur V. Bostrom. The Peoples City Bank filed a motion for judgment n. o. v. which was refused by the court in banc. This is an appeal from the refusal of that motion.

Arthur V. Bostrom, of defendants, came into possession originally under the lease, Exhibit "C", dated May 29, 1933, having to run from its date until the 31st day of March, 1934. Under its provisions, the said Bostrom covenanted and agreed to operate the property as an amusement park; and to keep and preserve the same in good order and repair. It further provided that if the said tenant should continue on the premises after the termination of the lease, the agreement was to continue in full force for another month and so on from month to month until legal notice be given for removal, each renewal being subject to the same terms and conditions of the lease. The tenant agreed to pay as rent, ten per cent of the gross receipts from the operation of the amusement park.

The agreement of sale, Exhibit "B", dated April 2, 1934, provided for the payment of $1000 on June 15, 1934, and a like sum on September 1, 1934, which two sums were to be applied to the payment of taxes, municipal assessments or other charges, insurance premiums and five per cent interest on the unpaid balance of purchase price. The balance of the taxes, municipal assessments or other charges, insurance premiums and inter-

est on the unpaid balance of the purchase price to April 1, 1935, to be paid on October 1, 1934.

The agreement further provided: "In the years 1935, 1936, 1937 and 1938, the said party of the second part shall pay the sum of One Thousand ($1,000) Dollars on the fifteenth day of July of each year and a like sum of One Thousand ($1,000) Dollars on the first day of September of each year to be applied to the payment of taxes, municipal assessments or other charges, insurance premiums and five per cent interest on the unpaid balance of the purchase money. On October first of each of the years 1935, 1936, 1937 and 1938 the said party of the second part shall pay the balance of the taxes, municipal assessments or other charges, insurance premiums and interest on the unpaid balance to April first of the following year, and shall pay at least One Thousand ($1,000) Dollars on the purchase price."

The party of the second part (Bostrom) was to pay the balance of the purchase price on October 1, 1938.

Upon payment of the purchase price of $35,000 with interest then due at the rate of five per cent, vendor agreed to deliver deed in fee simple, free from all encumbrances. Possession was to be delivered to vendee on signing of the agreement. Vendee agreed to keep the property in as good condition as it was at the signing of the agreement, and to make such repairs as should be necessary for the operation of said premises as an amusement park at his own proper costs and expense; vendee also agreed to operate the property as an amusement park. In the event of the violation by vendee of any of the covenants in the agreement, the whole of said purchase price with interest at the option of vendor was forthwith to become due and payable.

The possession of Bostrom was never interfered with from the time he entered on the property on the execution of the agreement until he gave up possession on April 14, 1939. Bostrom defaulted in his payments in

1935. He never paid anything on account of the purchase price.

At the trial of the case, plaintiff contended that the agreement of sale was not bona fide or sincere and that it was merely resorted to as a device or subterfuge for the bank to extract all the income from the property without being subjected to any of its liabilities, and, secondly, that the property had been in a state of disrepair at the time of the accident and for several years prior thereto.

Bostrom of defendants, testified that he did not have any capital to purchase the property and the clause was inserted at suggestion of Dr. Nason, president of the bank. Quoting from his testimony: "A. As far as I can remember we discussed the details of this agreement and the suggestion was made that this clause was put into the lease to purchase this property. I told him I didn't have any money, which, of course, he knew, because he knew my financial condition very well. So he claimed it would be advantageous to the bank to have this sale clause put into the lease. So I was satisfied and let it go at that. Q. Did he offer any explanation how it would be advantageous to the bank to have the $35,000 clause put into this paper? A. No, he did not and I did not ask him."

During the operation of the amusement park, Bostrom had cards printed and distributed showing that he was a manager. There is no evidence indicating any knowledge on the part of the bank or that the same was done at its instance or with its consent.

Appellee's brief quotes certain testimony of Ethel Maglin, Helen Frankel, Edith Maglin, Martha Bergad and Hyman Parker purporting to show the condition of the floors when Bostrom took possession. The testimony of Ethel Maglin is hearsay as it merely relates what Bostrom told her concerning the condition of the premises when he took possession. We do not believe that her testimony is sufficient to show the condition of the

premises when Bostrom took possession. The testimony of Edith Maglin and Martha Bergad describes the floor at the time of the accident and not at the time Bostrom took possession. The testimony of Helen Frankel is not sufficient to show the condition of the floor at any particular time. Her testimony is not that the floor was unsafe but that the place in general was neglected and no repairs were being made. Her testimony does not describe a condition but merely gives an opinion as to the condition of the place. That she was describing the conditions generally and not the floor is shown by the following quotation from her testimony: "Q. What can you tell us about the conditions of the floors? A. I can't say any more about the floors than would be general."

Hyman Parker, a witness on behalf of plaintiff, a building contractor who sometimes replaces floors, was allowed to give an opinion as to the condition of the floor although he had never examined it. This witness testified that the collapse of the board indicated that the floor was rotted and decayed; that had he examined the floor three years before the accident, he could have determined whether the floor was in bad condition. The witness further testified that it would not have been possible to tell by looking at the floor at the time it collapsed that it was dangerous and that he could only tell its condition after inspection by sounding and close observation.

The case was submitted to the jury on two questions: the first, as to whether the agreement of sale, Exhibit "B", was entered into in good faith, or whether the bank still remained in law and in fact the true owners of the property, and secondly, whether the bank and Bostrom, or either, were negligent in the maintenance of the premises.

The uncontradicted evidence was to the effect that Bostrom operated Rainbow Gardens from May 1933 to April of 1939. Quoting from his testimony: "Q. What did you do there? A. I managed the business and

looked after the park in general. Q. The receipts from the venture went to whom? A. Went to me. Q. You hired the work? A. I did."

The submission to the jury to determine the question of ownership or its verdict in no manner changed or affected the true situation between the bank and Bostrom, irrespective of whether the intention in the execution of the agreement of sale was as plaintiff contended. Under the agreement, Bostrum was placed in exclusive possession and control of the premises. The legal title still remained in the bank. The question for us to decide is the relative duty and responsibility of the bank and Bostrom in relation to the condition of the premises at the time Bostrom entered into possession under the agreement, and at the time of the accident, insofar as plaintiff is concerned. The evidence does not disclose any relationship of principal and agent as between the bank and Bostrom. We must, therefore, ascertain the responsibility on the basis of the general principles of law applicable to the facts in this case.

The relation between the bank and Bostrom, under the agreement of sale, pending the passing of title is more nearly analagous to that of lessor and lessee. Bostrom covenanted to keep the premises in repair. The bank assumed no obligation in that respect under the agreement.

The question of responsibility of a landlord or owner out of possession is discussed in *Hayden et ux., Appellants v. Nat. Bank of Allentown,* 331 Pa. 29, 199 A. 218, in a very comprehensive opinion by Mr. Justice DREW. We quote therefrom at pp. 31, 32: "The general rule is that the landlord who is entirely out of possession and control is not liable for bodily harm caused to the tenant and those upon the leased premises in the latter's right by reason of any dangerous condition existing when the tenant took possession. In other words, such a landlord owes no duty to persons coming upon the premises for conditions present at the time of the ten-

ant's entrance. To this rigid rule of non-liability there are but two exceptions: (1) when the landlord conceals or fails to disclose dangerous conditions of which he has knowledge and of which the tenant is unaware and cannot be expected to discover, and (2) where the landlord, who knows or should know of dangerous conditions, leases premises for a purpose involving the admission of many persons and has reason to believe that the tenant will not first correct the conditions. These principles (See Restatement, Torts, sections 356-362) were recently reviewed at length in *Harris v. Lewistown Trust Co.*, 326 Pa. 145; from them we have no intention to depart. Their application to the present case makes it clear that defendant owed no common-law duty to plaintiff's son. It is not contended that the landlord delivered possession of the premises to the tenant at a time when they contained concealed dangers known to the landlord and unknown to the tenant. Plaintiffs' contention that defendant is subject to liability under the second exception is untenable. That exception, exemplified by *Folkman v. Lauer*, 244 Pa. 605, and *Kane v. Lauer*, 52 Pa. Superior Ct. 467, contemplates the lease of premises suitable for accommodating large numbers of the public, such as a theatre, auditorium, stadium, grandstand, or similar construction. Obviously a public garage does not fall within the purview of the exception. If it did, any building into which members of the public came to do business with the tenant would be included; such an extension of the exception would leave nothing of the general rule save the lease of a private dwelling." See also *Bouy v. Fidelity Philadelphia Trust Co., et al.*, 338 Pa. 5, 12 A. 2d 7.

In the instant case, appellee contends that a swimming pool involves the admission of a large number of persons as patrons of the lessee within the meaning of the second exception (Restatement, Torts, section 359) to the rule of a landlord's non-liability. The cases of *Folkman v. Lauer*, supra, and *Kane v. Lauer*, supra,

have been cited as authority for appellant's liability under that exception. In those cases, the accident was caused by the admission of a large number of persons to a grandstand and such a situation is covered, but in the instant case, it was not the admission of a large number of persons to the bathhouse that caused the accident. Obviously the exception referred to, seeks to impose liability in those instances where a collapse of a structure occurs by reason of the massing of a large number of persons upon it.

There is another objection to the application of section 359 under the facts of this case. There is no competent evidence upon which to base a finding that appellant had reason to expect that Bostrom would admit his patrons before the bathhouse was put in a reasonably safe condition. Conceding that Bostrom did not have the purchase price of the property when he signed the agreement, it does not follow therefrom that his financial resources were, to the knowledge of appellant, insufficient to make any repairs that might be required. Moreover, the agreement itself placed the duty of keeping the premises in repair upon Bostrom. It appears, therefore, that appellant had no reason to expect that Bostrom would fail to make any repairs required before the admission of patrons to the premises.

As to the alleged control by lessor, because of the drilling of a well for water or the laying of a pipe line, it is sufficient to say that both of these matters occurred after the happening of the accident in the instant case and have no bearing on the questions involved.

The first assignment of error is sustained, judgment reversed and now entered in favor of Peoples City Bank of defendants.