Whitfield, Appellant, *v.* Reading Company.

Argued January 10, 1955.   Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Milford J. Meyer,* with him *R. Lawrence Clay,* and *Meyer, Lasch, Hankin & Poul,* for appellant.

*W. Heyward Myers, Jr.,* with him *Henry R. Heebner,* and *Morgan, Lewis & Bockius,* for appellee.

OPINION PER CURIAM, March 14, 1955:

At the trial of this action for damages for personal injury, the jury returned a verdict for the defendant whereon judgment was entered after the plaintiff's motion for a new trial had been denied. We affirm the judgment on the following excerpts from the opinion of President Judge LEWIS for the court en banc, which correctly and adequately disposed of the contentions which the plaintiff renews on this appeal.

"Plaintiff brought this action against defendant corporation to recover damages for personal injuries. At the trial, plaintiff testified that he had been for many years employed at the industrial establishment of Crown Paper Mill Company located on the Northeast corner of Delaware Avenue and Tasker Street in Philadelphia, where he was a night worker; that on November 29, 1950, he finished work at 7:00 A.M. and, pursuant to custom, started to cross Delaware Avenue

at Tasker Street on his way to board a bus at Front and Tasker Streets. He stated that his path was blocked by a freight train that was running North on Delaware Avenue, so he stopped to await the passing of the train. He was standing in the cartway of the very wide commercial highway, which was paved with cobblestones, when he saw a large truck, a tractor-trailer combination, 'come up' going north at 'about fifty or fifty-five miles an hour' and headed toward him. He stepped 'up one or two steps nearer the train so that this truck would have more room to pass by' him, and when he was still standing waiting for the end of the train, he saw 'this bar' sticking all the way out past the side of the freight train and so close to him that he 'couldn't do nothing about it, couldn't get out of the way or do anything before this bar caught' him by the belt of his coat and knocked him down. The bar was described as an uncoupling lever. Plaintiff was thrown under the train, with the result that his left arm was amputated near the shoulder by the cars.

"Testimony was given describing the customary location of uncoupling levers on cars of different types, which evidence indicated that when in proper position the uncoupling lever does not project beyond the side of the railroad car but terminates several inches inside of the outer edge of the car. The inference, therefore, was that there was a defective condition of the uncoupling lever and that the railroad company was negligent in permitting this defect to exist on a car forming part of a train proceeding on a public highway.

"However, plaintiff was cross examined with respect to a statement made by him on December 13, 1950 (two weeks after the accident) at the Mt. Sinai Hospital, when plaintiff was interviewed by a representative of the railroad who was accompanied by a

stenographer who recorded the questions and answers, and then transcribed his notes, which were produced at the trial. Plaintiff said he remembered some men coming to the hospital, but did not think it was just before he left (December 14, 1950); he denied any recollection of various statements which he was recorded as having made with reference to the manner of occurrence of his injury.

"For the defendant, G. W. Lore, of the Claim Department of the Pennsylvania Railroad, testified that he went to the Mt. Sinai Hospital on December 13, 1950, and questioned plaintiff about the accident, and had a Mr. Blumberg, an official reporter for the United States District Court, take notes of everything said. Mr. Blumberg testified that he recorded all questions and answers stenographically and made a typewritten transcript, which was received in evidence. In this statement plaintiff is recorded as having said that he was waiting for a train to pass on Delaware Avenue; that he then saw a tractor-trailer truck coming right at him; from the way it was being driven plaintiff thought that the driver was intoxicated; when the truck was within twenty-five or thirty feet from him he tried to get out of the way; 'I was standing still until the truck came, then I jumped aside, just like you would try to do'; 'If I had not got away there, that truck would have hit me and knocked me under there and killed me. I didn't have no place at all to see what I did . . .'; 'When I stepped on the side that time, I stepped down to the train, the train hit me, the car box hit me.' No mention was made of any protruding bar or lever.

"The plaintiff was asked the direct question: 'What part of the train was it that struck you?' His reply was: 'What struck me? The *corner part* of it. When it hitted me, knocked me right up under there where the

coupler is. When I got under there, the coupler drag me . . .'

"Witnesses for defendant testified as to the condition of the train. Two witnesses said they examined the cars in the vicinity of where the arm was lying, and found flesh marks on the right forewheel of a loaded hopper car, Western Maryland No. 16594. They found no defects in this car, the uncoupling lever being in its proper place and position.

"The verdict of the jury was for the defendant. Plaintiff's counsel moved for a new trial, alleging several errors on the part of the trial Judge in admitting or refusing to strike out certain evidence. The witness, G. W. Lore, had stated in response to a question by the Court that prior to interviewing the plaintiff in the hospital, he 'got approval from Dr. Bartleson.' It was contended at the argument that this statement should have been stricken from the record. The hearsay rule of exclusion of evidence applies only to extrajudicial utterances offered as evidence of the truth of the matter asserted (*Wagner v. Wagner*, 158 Pa. Super. 93, 97 (1945); *Ryman's Case*, 139 Pa. Super. 212, 221 (1939); Wigmore, Evidence, Sec. 1766 (3d Ed. 1940)). The admission of this testimony by Mr. Lore did not violate the hearsay rule, since it was not offered to prove the truth of the matter therein contained—but only that it was said, and as a result the witness interviewed the plaintiff. Furthermore, in plaintiff's own statement, a recital to the same effect appears.

"It was also objected to that the transcript of plaintiff's statement while confined in the hospital was allowed to go with the jury when they retired to deliberate. It is within the discretion of the trial court whether documentary evidence properly admitted (with the exception of depositions or transcripts of testi-

mony) should be sent out with the jury (*Durdella v. Trenton-Phila. Coach Co.*, 349 Pa. 482, 484 (1944); *Brenner v. Lesher*, 332 Pa. 522, 528 (1938)). An admission is not the same as a deposition. In the case of *Brenner v. Lesher*, 332 Pa. 522 (1938), it was held that it was in the discretion of the trial court whether an admission could accompany the jury when they retired to consider their verdict. (See also *Kline v. First National Bank of Huntington*, 2 Monaghan (Pa.) 448 (1888); *Commonwealth v. Murphy*, 92 Pa. Super. 139 (1927)). In the present case there was no abuse of this discretion. It was essential that the jury should examine the statement in order to determine whether it was made by a man in a mental condition to know what he was doing and saying.

"Following the charge to the jury, the trial Judge asked counsel: 'Is there anything to be added?' Counsel for the plaintiff stated that he was perfectly satisfied with the charge on the burden of proof and the weight of the evidence. However, out of caution, the Court proceeded to give further instructions to the jury on the burden of proof. The charge in its entirety more than covered this subject.

"Plaintiff contends that the trial Judge erroneously charged the jury as to the condition of the train involved. No exception was taken at the trial to this part of the charge. Without deciding whether the trial Judge correctly stated the facts, it is enough to say that at the conclusion of his charge he told the jury: 'You are not bound by my recollection of the evidence. You are not at all bound by my interpretation of the evidence. You are the ones to make all findings of fact . . .' If there was any mistake committed by the trial Judge in his recollection of the facts involved, this was corrected by the quoted instructions. (*Knapp v. Griffin*, 140 Pa. 604 (1891)).

"The charge was adequate, impartial, and in full accord with the decisions of the courts of this Commonwealth. . . .

"It was for the foregoing reasons that we dismissed plaintiff's motion for a new trial. From a reading of the entire record, we concluded that the result of the trial, unfavorable to the plaintiff, is to be attributed solely to the jury's justifiable disbelief of the testimony given by plaintiff as to a protruding iron bar having struck him. He undoubtedly collided with or was hit by the end of a freight car, as he sought hurriedly to avoid being struck down by a speeding tractor-trailer."

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On November 29, 1950, at 7 a.m., after working all night at the Crown Paper Mill Company plant in Philadelphia, the plaintiff, Perry Whitfield, started across Delaware Avenue for the purpose of boarding a bus at Front and Tasker Streets. At Delaware Avenue he was confronted with a freight train moving northwardly on tracks imbedded in the street. While waiting for the train to pass over the crossing, a truck, also travelling northwardly on Delaware Avenue, advanced with such speed and proximity to the spot where the plaintiff stood, that he was compelled to move forward to within 3 feet of the railroad track but not close enough to be touched by the train. Suddenly he felt himself thrown under the cars, wheels passed over his left shoulder and he was separated from his arm.

Two weeks later, while in the Mt. Sinai Hospital, a railroad claim agent (G. W. Lore), accompanied by a stenographer, called on him and subjected him to an

extensive interrogation while the stenographer record-
ed the questions and answers. This visitation on the
part of the railroad claim agent, under the circum-
stances, was a shocking infringement of the plaintiff's
rights. On what basis of elemental American fairness
does a hostile party invade the domain of a man's
grief, pain and agony and catechize him while he suf-
fers in a hospital bed, his thoughts awry, his spirit in
torture and his memory still in shock from the in-
tolerable recollection of that unbearable moment when
he felt the steel wheels grinding, sawing and slicing
away his arm from his body?

Before the claim agent interrogated the plaintiff
on the accident he examined him at great length on
his wages, his hours of employment, his social security,
whether he carried accident and health insurance, the
length of his employment with the Crown Paper Mill
Company, etc., etc. His questioning amounted to an
inquisition which could only wear down the plaintiff,
reduce his physical strength and confuse his mental
faculties. While the questioning was taking place, a
third person, almost like a phantom appeared on the
scene. The transcript reveals: "Q. I see. Can you tell
me this: What did you average a week? (A gentle-
man appeared at the bedside.) A VOICE: My name
is Burgess, Aetna Casualty." The claim agent then
went into the career of the Crown Paper Company and
other things which by no stretch of the imagination
were involved in the accident. There was no one pres-
ent to protect the helpless patient from his uninvited
inquisitioner. When the claim agent had finished he
turned to the phantom Burgess of the Aetna Casualty
and Surety Company and very generously said to him:
"Well, Mr. Burgess, would you like to ask Mr. Whit-
field a few questions?" And Burgess replied: "Well, I
probably got in at the tail end." Then Mr. Burgess

took up the inquest. At one point when the plaintiff was apparently too exhausted to answer a query put by Burgess, Mr. Lore intervened with: "Isn't what you are trying to say, Mr. Whitfield, that there is more than one track there; etc.?" For 18 pages these two cross examiners tormented the injured man who was still bleeding and grieving over the loss of his arm.

Although the defendant railroad company had the transcript in its possession for over two years and a half prior to the trial, it never submitted it to the plaintiff for verification. At the trial the defendant introduced the transcript in which, according to the defendant, the plaintiff told a different story from that which he related on the witness stand as to how the accident occurred. In explanation, the plaintiff said: "I don't know what I said. I was out of my mind. It was a long time before I got right again with my mind."

Also: "I don't remember anything. Part of the time I was out of my mind. I was in such pain."

At the termination of the trial the Judge sent the transcript out with the jury and instructed them to determine by reading it whether as the plaintiff stated he was in a confused state of mind when he was being interrogated at the hospital. The Judge also said to the jury that on one of two occasions (either in the hospital or while on the witness stand) the plaintiff told an untruth. This, I believe, was error. If there was a difference between the two statements it was the province of the jury first to attempt a reconciliation between them, if possible. In *Danko v. Pittsburg Railways Co.,* 230 Pa. 295, this Court said: ". . . it is the province of the jury to *reconcile the conflicting statements,* whether of the same or different witnesses, or to *draw the line* between them and say which shall pre-

vail."\* But here the Judge drew a line for the jury and ordered them to pitch their tent of acceptable testimony on one side or the other, ignoring the principle that in the sunlight of analysis, deliberation, and reconciliation, the truth could well be on both sides of the line. It did not mathematically follow that because the two statements were not exactly alike the plaintiff had to be lying in one or the other instance. It could be, as the plaintiff stated, that at the time of the making of the transcript he was not in the full possession of his faculties because of the ordeal through which he had just passed and was still undergoing.

On the witness stand in Court, the plaintiff testified that the accident happened as follows: "While I was stopped waiting for this train to pass by, I seen this truck come up, it was going north, too. I stepped up one or two steps nearer the train so that this truck would have more room to pass by me, but as I had stepped up and was still standing waiting for the end of this train, I seen this bar sticking all the way out past the side of this freight car. When I see it it was so close to me I couldn't do anything about it, couldn't get out of the way or do anything before this bar caught me by the belt of my coat and it knocked me down and then it started dragging me along the side of the freight car. By the Court: Q. What started dragging you? A. This bar. Q. It caught in your coat? A. Caught the belt of my coat and the first thing I knew, I was underneath this freight car, on the tracks, and that was how the car run over my arm, when I was underneath it, and that's all about that part of it."

It is to be noted here that while this testimony contains the usual grammatical errors which one would

---

\* All italics, mine.

expect from a workingman lacking higher education, it still gives a clear and understandable account of what occurred. The testimony taken at the hospital is somewhat different. There, he described the accident as follows: "Q. What part of the train was it that struck you? A. What struck me? The corner part of it. When it hitted me, knocked me right up under there where the coupler is. When I got under there, the coupler drag me. So that is when I caught this arm against it. When I got straigtened, my body was laying across the track, so I scrambling and fight against it, so when it is to get there, caught this arm, and cut this arm." It must be obvious to any one that this narrative is confused and mixed-up and could well be the speech of someone struggling for orientation amid exhaustion and pain. The Judge should have, but he did not, instruct the jury that it was their duty to determine whether this confusing narrative could be reconciled with the statement the plaintiff made in Court. The plaintiff also stated in the transcript: ". . . and when I stepped on the side that time, I stepped down to the train, the train hit me, the *car box* hit me."

What did the plaintiff mean by the "car box"? Could this possibly have been the bar he referred to at the trial? Toward the end of the transcript the claim agent Mr. Lore asked the plaintiff: "Is there anything else you would like to add to what you have already said about your accident?" The plaintiff's reply is another indication of his condition: "No, not yet awhile, you know. Like not yet." Mr. Lore was still not satisfied. He asked the plaintiff for information as to the location of the train crew and what they might have said. The plaintiff replied: "I don't know much where they were located, because when a man loses his arm and come back to the plane, all they are trying to rush

him to the hospital, and I couldn't say that, because I wouldn't even much know what I was talking about."

I believe that these excerpts demonstrate that the plaintiff was in no condition to be interrogated at the hospital and, for that reason, the transcript should not even have been admitted in evidence. At any rate, it was quite improper to send the transcript out with the jury. As far back as 1794 this Court said, with reference to this subject: "Witnesses are not allowed to go out with the jury on their leaving the bar, and why should depositions be treated differently? The party who has no depositions would, under a contrary practice, acquire an undue advantage." (*Arwin v. Bisbing,* 1 Yeates, 400.)

In 1951 the Superior Court said: "Normally, neither notes of testimony nor portions thereof can be sent to the jury. . . . The rule is not affected by the fact that prior notes of testimony are transcribed and therefore in writing." (*Zank v. West Penn Power Co.,* 169 Pa. Superior Ct. 164, 167.)

In the case of *Brenner v. Lesher,* 332 Pa. 522, this Court said that it is "well settled law" that depositions and transcriptions of testimony are not to go out with the jury.

If the plaintiff had testified at a prior trial and an offer were made at a second trial to send out his testimony with the jury, the offer would unquestionably be rejected. If the plaintiff had sworn to a deposition prior to the beginning of this trial and an offer had been made to introduce that deposition, the offer would properly be rejected. How then can the Majority justify the sending out to the jury of an unsworn transcript which is infinitely less reliable than either of the instances given?

The Majority (accepting the Opinion of the lower court as its own) endeavors to explain away the viola-

tion of the venerable rule just discussed by asserting that the hospital transcript was documentary evidence. How was it a document? It was not written by the plaintiff, it was not signed by the plaintiff, and it was specifically repudiated by him.

In my opinion the lower court committed another serious error which the Majority here has apparently regarded as of no importance. Mr. Lore, the railroad claim agent, was allowed to testify that prior to interrogating the plaintiff, he got the approval of the hospital physician, Dr. Bartleson. We do not know whether he got that approval or not since Dr. Bartleson was not called. No one testified that the plaintiff was well enough to answer questions. Yet the court below allowed the defendant's attorney to question Mr. Lore in such a way as to convey the idea that a qualified doctor had officially found that the plaintiff was in condition to be interrogated, when in point of fact there was no such proof at all. The Court itself questioned: "Q. Did you have hospital approval— A. I did, sir. I got approval from Doctor Bartleson. Mr. Meyer: I move that that be stricken out. The Court: What? Mr. Meyer: The question and the answer, as entirely hearsay. The Court: Whether he had hospital approval to see the man? Mr. Meyer: Yes, sir. The Court: Motion refused."

This was hearsay of a particularly aggravated character. The Majority seeks to justify it with the argument that the testimony "was not offered to prove the truth of the matter therein contained—but only that it was said, and as a result the witness interviewed the plaintiff." With all respect, I can only say that this argument is specious. There would be no purpose for the testimony except to show exactly what it said, namely, that the hospital authorities stamped the plaintiff in good physical condition for interroga-

tion. If the purpose was only to show that *"it was said"*, why wasn't the man who said it produced as a witness? In fact, why wasn't the man produced anyway so that the plaintiff could cross examine him? The plaintiff already had lost one arm. Denying him the right to cross examine his accusers meant a crippling of the other arm of his case.

Fully dedicated as he is to the concepts of impartiality, justice and fairness, the Trial Judge's unfortunate choice of language makes him appear not only partial but almost as a partisan of the railroad company. He said in his charge: "Now, I am not a lawyer for the railroad company. I have no interest in the railroad, a stock interest or otherwise. My only interest is to see that justice is done in this court, so far as I can bring that about in a proper manner. I am sympathetic with this plaintiff. I liked him on the witness stand, he made a good impression on me. But as a judge I cannot like him if he perjures himself. As a judge, if he lied here on the witness stand in order to get damages he is not entitled to, I must like him not. At one time or another he told the truth. Was there any reason for these two men to go on the witness stand and falsely swear that he gave that statement to them in the hospital? You decide that."

Whether the Judge liked the plaintiff or not had utterly no bearing on the case. Nor does a Judge proclaim his commendations, and certainly not his antipathies, from the bench. The average juror, hearing a judge say: "If he lied here on the witness stand in order to get damages he is not entitled to, I must like him not," would be apt to conclude that the Judge liked the plaintiff *not,* especially when the Judge almost immediately after argues: "Was there any reason for these two men [the railroad agent and the stenographer] to go on the witness stand and falsely swear

that he gave that statement to them in the hospital?" The Judge explained to the jury that the plaintiff might have lied in order to get damages he was not entitled to, but did not explain that the railroad company witnesses might have lied in order to save for the railroad company money which, under the circumstances, it might otherwise have to expend. The impartial judge who introduces the goose in his argument must take pains not to overlook the gander.

The Trial Judge also ushered into the jury box a matter which was absolutely extraneous to the issue involved. In discussing the jury's duty to choose between the two conflicting accounts as to how the accident occurred, the Judge said: *"It is no public service to encourage false claims. On the other hand, it is a public service to stamp heavily upon people who institute suits based upon false considerations."* The subject of false claims was entirely outside the orbit of the lawsuit. The jury's duty was simply to determine whether the plaintiff had proved his claim that the railroad had not exercised due care under the circumstances. There was no responsibility on the part of the jury, or the Judge, to "stamp heavily upon people who institute suits based upon false considerations." Any stamping upon people, whether it is permissible at all in our democracy, is a matter for the Criminal Law Courts and not for the Courts of Common Pleas. When the Trial Judge spoke with such expressive and emphatic language about false claims he inevitably suggested to the jury (even though he did not intend it) the great possibility that a false claim was the basis of this particular litigation. The Court's emotional utterance could also have conveyed to the jury the idea that it was their duty to inflict punishment rather than pass upon a question of civil liability. To the extent that the Judge beckoned the jury away from the

path of factual considerations and invited them into the councils of calculated correction and retribution, to that extent the plaintiff was deprived of a fair and just trial.

After thoroughly reading the whole record in this case, and after pondering deeply on the Court's charge, the introduction of hearsay testimony and the use of the untrustworthy hospital transcript, I can regretfully come to only one conclusion and it is, namely: At the termination of the trial, the plaintiff's chances for a favorable verdict were as slim as the possibility that another arm will grow in the empty sleeve which now dangles in the melancholy air.