452 A.2d 501

**Mara REICHMAN, Appellant at No. 2261 Phila. 1980,**

**v.**

**Edward WALLACH, M.D. and the Pennsylvania Hospital.**

**Appeal of Edward WALLACH, M.D., at No. 2198 Phila. 1980 and No. 450 Phila. 1981.**

Superior Court of Pennsylvania.

Argued May 28, 1981.

Filed Oct. 29, 1982.

Petition for Allowance of Appeal Denied March 14, 1983.

William F. Sullivan, Jr., Philadelphia, for Wallach.

James E. Beasley, Philadelphia, for Reichman.

Before WICKERSHAM, WIEAND and McEWEN, JJ.

WIEAND, Judge:

In this medical malpractice case Mara Reichman sought damages for ulcerative colitis and neuroses, which she contended had been caused by stress resulting from a failure of a gynecologist and agents of a hospital to prevent and/or correct promptly internal bleeding which followed the performance of a hysterectomy. A jury returned a verdict for $429,960 against the gynecologist, Dr. Edward E. Wallach, and also against The Pennsylvania Hospital. The trial court subsequently set aside the verdict against the hospital and entered judgment n.o.v. in its favor. Dr. Wallach's post verdict motions were denied, however, and he appealed from the judgment entered on the verdict. Mrs. Reichman ap-

pealed from the order entering judgment n.o.v. in favor of The Pennsylvania Hospital.

Mara Reichman consulted Dr. Wallach in October, 1973, after a routine physical examination had disclosed the presence of a pelvic mass. Dr. Wallach's examination confirmed the presence of the mass, but it was not possible by examination to determine the precise nature of the tumor or whether it was malignant. This was explained to Mrs. Reichman. Dr. Wallach recommended that she undergo a laparotomy, with removal of the uterus, fallopian tubes and ovaries. Mrs. Reichman hesitated, but by November 13, 1973, the mass had increased in size and was palpable abdominally. Dr. Wallach again recommended a total hysterectomy. Still Mrs. Reichman hesitated. After consulting further with Dr. Viner, her internist, who made a separate examination, Mrs. Reichman consented to surgery. According to her testimony, she instructed Dr. Wallach not to remove her ovaries unless they were diseased and "life-threatening." Mrs. Reichman was admitted to The Pennsylvania Hospital on December 4, 1973, and on December 7 a total abdominal hysterectomy and bilateral salpingo-oophorectomy was performed.

Because Mrs. Reichman had a history of hypertension and high blood pressure, Dr. Viner requested that Dr. Troncelliti, chairman of the hospital's anesthesia department and supervisor of the recovery room, administer a spinal anesthetic. Surgery began at 8:00 o'clock, A.M., and was completed without observed complications by 10:00 o'clock, A.M. Because the natural tendency of the spinal anesthesia administered to Mrs. Reichman was to paralyze the sympathetic nerves and dilate the vessels, thus lowering the patient's blood pressure, her blood pressure was artificially elevated during and following surgery by the use of neo-synephrine. When its use was discontinued in the recovery room at or about 1:00 o'clock, P.M., Mrs. Reichman's blood pressure fell precipitously. Consequently, the use of neo-synephrine was resumed, and Mrs. Reichman was monitored closely for signs that a normal blood pressure was returning. Because of the

blood pressure condition, Mrs. Reichman was kept in the recovery room until it was closed at 6:00 o'clock, P.M. It was then unknown whether her inability to maintain normal blood pressure was attributable to the anesthesia or to internal bleeding. Dr. Troncelliti believed that the patient required continued careful monitoring, and he contacted Dr. Wallach, who, together with Dr. Viner, examined Mrs. Reichman. Because her failure to respond adequately to drugs, plasma, fluids and whole blood intended to stabilize her blood pressure suggested the possibility of internal bleeding, Drs. Viner and Wallach caused her to be placed in an intensive care unit. After Mrs. Reichman had spent a restless night in intensive care, surgery was performed to correct what was then believed to be internal bleeding. The source of the bleeding was determined to be a branch of the ovarian artery, approximately two inches above the site of the original dissection of the ovarian bundle, and it was doubly ligated to arrest the bleeding. A retroperitoneal hematoma, which had formed as a result of the bleeding, was also removed. Surgery was completed at 9:20 o'clock, A.M., and Mrs. Reichman was returned to her hospital room in what appeared to be satisfactory condition after one hour in the recovery room.

Post operatively, Mrs. Reichman developed abdominal pain, vomiting, nausea, diarrhea, and an inability to eat solid foods. She also lost weight, and an abnormality of her liver enzymes was discovered. These symptoms, she testified, continued after her discharge from the hospital on January 18, 1974. There followed a series of four hospitalizations during the next seven months, none of which disclosed the etiology of Mrs. Reichman's symptoms. In February, she returned to Pennsylvania Hospital for five days with the same complaints. On March 6, she was readmitted, only to be discharged on March 11 without diagnosis. Her symptoms persisted, however, and she also developed a temporary swelling of the face and legs and hemorrhagic cystitis. On April 7, she was admitted to the Hospital of the University of Pennsylvania and remained there for nine weeks, during

which numerous tests failed to disclose a physiological explanation. Mrs. Reichman testified, however, that her treating physicians suspected a hidden malignancy, which caused her to be placed in a "cancer ward." Finally, on June 14, 1974, she entered Mt. Sinai Hospital in New York under the care of Dr. Zimmerman, a gastroenterologist. Here, an eleven week hospitalization, an exploratory operation and myriad tests also failed to disclose the cause of Mrs. Reichman's symptomology, and she was discharged on August 19.

Mrs. Reichman continued thereafter under the care of Dr. Zimmerman and, on September 20, 1974, a sigmoidoscopic examination disclosed the presence of ulcerative colitis, a chronic, debilitating disease of the large intestine. Dr. Zimmerman and Dr. Rieger, an expert witness employed on Mrs. Reichman's behalf, testified that there is no cure for ulcerative colitis, that persons suffering from the disease require medical care for the remainder of their lives, and that in some cases a colostomy is required during the later stages of the disease.

## I. THE MOTIONS FOR JUDGMENT N.O.V.

In order to establish the liability of the defendants, appellee was required to establish by competent evidence that the conduct of Dr. Wallach and the agents or employees of The Pennsylvania Hospital had fallen below the standards of reasonable medical practice, and that her injuries had been caused by their failure to provide such medical care. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 595, 417 A.2d 196, 199 (1980); *Hamil v. Bashline,* 481 Pa. 256, 265, 392 A.2d 1280, 1285 (1978); *Collins v. Hand,* 431 Pa. 378, 383, 246 A.2d 398, 401 (1968); *Richmond v. A. F. of L. Medical Service Plan of Philadelphia,* 421 Pa. 269, 270–271, 218 A.2d 303, 304 (1966); *Donaldson v. Maffucci,* 397 Pa. 548, 554, 156 A.2d 835, 838 (1959); *Pratt v. Stein,* 298 Pa.Super. 92, 120 n. 23, 444 A.2d 674, 689 n. 23 (1982); *Ragan v. Steen,* 229 Pa.Super. 515, 521, 331 A.2d 724, 727–728 (1974).

However, appellee was not required to establish that the negligent acts or omissions of the defendants were the

sole cause of her injuries. It is now well settled that in a medical malpractice action to which Section 323(a) of the Restatement (Second) of Torts [1] is applicable, once a plaintiff has established a prima facie case of professional negligence through the introduction of expert testimony, which negligence has increased the risk of harm, the issue of proximate cause is to be determined by the jury. "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Hamil v. Bashline, supra,* 481 Pa. at 269, 392 A.2d at 1286. A prima facie case of professional negligence under Section 323(a) can be established by "expert opinion testimony to the effect that defendant failed to exercise reasonable care in performing an undertaking to render services to a patient which the defendant should recognize as necessary for the other's protection, that this failure increased the risk of physical harm to the patient, and that such harm did in fact result." *Gradel v. Inouye,* 491 Pa. 534, 541, 421 A.2d 674, 677 (1980) quoting *Hamil v. Bashline, supra,* 481 Pa. at 262, 392 A.2d at 1283. Accord: *Jones v. Montefiore Hospital,* 494 Pa. 410, 416–417, 431 A.2d 920, 924 (1981); *Hoeke v. Mercy Hospital of Pittsburgh,* 299 Pa.Super. 47, 54, 445 A.2d 140, 144 (1982).

"[In] an appeal from the denial of a motion for a judgment n.o.v., the evidence must be viewed in a light most favorable to the verdict winner. Evidence supporting the verdict is considered, and the rest is rejected. All conflicts

1. Section 323(a) of the Restatement (Second) of Torts provides as follows:

§ 323. Negligent Performance of Undertaking to Render Services One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm
. . . .

in the testimony are resolved in favor of the verdict winner, [Mrs. Reichman] herein. *Rutter v. Morris,* 212 Pa.Super. 466, 243 A.2d 140, 141 (1968)." *Pratt v. Stein,* 298 Pa.Super. 92, 105, 444 A.2d 674, 681 (1982), quoting *Grubb v. Albert Einstein Medical Center,* 255 Pa.Super. 381, 390–391, 387 A.2d 480, 484 (1978). Accord: *Atkins v. Urban Redevelopment Authority of Pittsburgh,* 489 Pa. 344, 351, 414 A.2d 100, 103 (1980); *Broxie v. Household Finance Company,* 472 Pa. 373, 380, 372 A.2d 741, 745 (1977); *Metts v. Griglak,* 438 Pa. 392, 395, 264 A.2d 684, 686 (1970); *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 27, 434 A.2d 106, 112 (1981).

■ In determining the sufficiency of the evidence, we consider the evidence actually received, whether the trial rulings thereon were correct or not. *Jones v. Treegoob,* 433 Pa. 225, 229, 249 A.2d 352, 354 (1969); *Carney v. Pennsylvania Railroad Company,* 428 Pa. 489, 497, 240 A.2d 71, 75 (1968); *Brandon v. Peoples Natural Gas Co.,* 417 Pa. 128, 134–135, 207 A.2d 843, 847 (1965); *Rosche v. McCoy,* 397 Pa. 615, 619, 156 A.2d 307, 309 (1959); *Rodgers v. Sun Oil Company,* 189 Pa.Super. 559, 563, 151 A.2d 673, 676 (1959); *Hughes v. Hanna,* 187 Pa.Super. 466, 469, 144 A.2d 617, 619 (1958). "However, where the evidence is insufficient to sustain a verdict against the losing party, a court will enter judgment n.o.v. in favor of the appellant despite a verdict to the contrary." *Szumski v. Lehman Homes, Inc.,* 267 Pa.Super. 478, 481, 406 A.2d 1142, 1143 (1979). Accord: *Mike v. Borough of Aliquippa,* 279 Pa.Super. 382, 389, 421 A.2d 251, 254 (1980); *Kolb v. Hess,* 227 Pa.Super. 603, 323 A.2d 217 (1974).

■ It was Mrs. Reichman's contention that Dr. Wallach had negligently performed the hysterectomy and had again violated medical standards by waiting until the following morning to perform a second operation to correct the bleeding ovarian artery. The evidence of negligence in performing the hysterectomy, although neither specific nor compelling, was sufficient to be submitted to the jury. Dr. George C. Lewis, Director of Gynecology at Jefferson Medical College, was asked: "Doctor, in the ovarian bundle branch area,

if reasonable medical care is exercised, should there be an arterial bleed the size of the ovarian artery?" His answer was "no." Although he conceded on cross-examination that arterial bleeds can and do occur from time to time under the best of care, he did not deviate from his earlier opinion regarding the exercise of reasonable medical care.

The opinion evidence that Dr. Wallach had been guilty of post operative negligence was clearer and more direct. Dr. Lewis testified that under the circumstances as then known, reasonable medical care dictated that corrective surgery be performed between 4:00 o'clock and 9:00 o'clock, P.M. on the same day on which the hysterectomy had been performed and that it was medical negligence to delay such surgery until the following morning. Dr. Zimmerman, appellee's gastroenterologist, testified that although medical science is uncertain of the exact etiology of ulcerative colitis, in his opinion the formation of the hematoma, the length of time that she had been under close and prolonged monitoring, and the stresses resulting from the surgical procedures and during the post-operative periods were the factors which caused her to develop ulcerative colitis in August or September of 1974. Dr. Wolfgram Reiger, a psychiatrist who had been treating Mrs. Reichman since October 17, 1977, testified that Mrs. Reichman was suffering from marked depression, anxiety and traumatic neuroses, as well as ulcerative colitis, and said: "The post-operative course, and specifically the complications, represent the very trauma that caused these many neuroses that I have described and also directly caused the ulcerative colitis."

We conclude, as did the lower court en banc, that this evidence was sufficient, if believed, to support a finding of causative negligence against Dr. Wallach. Consequently, the court correctly denied the doctor's motion for judgment n.o.v.

■ The court's entry of judgment n.o.v. in favor of The Pennsylvania Hospital was also correct. Although it was Mrs. Reichman's contention that the hospital staff had failed to exercise reasonable medical care in monitoring her condi-

tion while she was in the recovery room, the evidence did not support that contention. Indeed, her own witness, Dr. Lewis, testified during cross-examination that Mrs. Reichman had been "adequately monitored" in the recovery room; and Mrs. Reichman herself testified that Dr. Troncelliti, the anesthesiologist in charge of the recovery room, "was all the time next to me. He attended all the time. He was very concerned."

In support of her appeal from the order entering judgment n.o.v. in favor of the hospital, Mrs. Reichman relies on the following testimony of Dr. Zimmerman, her gastroenterologist:

Q. Doctor, taking into consideration the recovery room record, do you have an opinion based upon reasonable medical certainty as to whether Mrs. Reichman received reasonable medical care *during the time* that she was in the recovery room?

A. Yes, I do.

Q. And what is that opinion?

A. I think she had terrible medical care.

Q. Do you have an opinion as to whether the failure to exercise that reasonable medical care *during the recovery room period* is the cause of her condition today?

A. Yes, sir.

Q. And what is that?

A. It is.

Q. Doctor, do you have an opinion based upon a reasonable medical certainty that if the patient had received proper recovery room care and had been reoperated before the establishment of the hematoma, whether she would have had an uneventful recovery?

\* \* \* \* \* \*

A. I can answer the question, sir. I think she would have had a reasonable recovery.

N.T. 361(a), 363(a). (Emphasis supplied.)

It is impossible to ascertain from the witness' opinion that Mrs. Reichman received "terrible medical care," whether he

was referring to the decisions made post-operatively by Drs. Wallach and Viner or whether the monitoring of Mrs. Reichman's condition by hospital personnel fell within the scope of his condemnation. Moreover, he furnished no reasons for his conclusion and identified no act or failure to act by Dr. Troncelliti or any other hospital staff member or employee that breached applicable medical standards.

The lower court observed, and we agree: "The record fairly indicates that the general functions of the recovery room are threefold: (1) to monitor the patient's vital signs; (2) to administer medical care in achieving post-operative recuperation; and (3) to advise the attending physician on any significant problems with respect to the patient's condition of which the physician should be made aware. The evidence wholly fails to furnish a sufficient factual basis to enable reasonable minds to conclude that the hospital negligently failed to perform any of these functions."

Dr. Zimmerman was not asked and expressed no opinion regarding the care exercised by Dr. Troncelliti or by any other member of the hospital staff assigned to the recovery room. His opinion that Mrs. Reichman "had terrible medical care" identified no person responsible therefor and was delivered in a total vacuum. It was not a response to a hypothetical question and was sustained by neither facts nor reasons.

"We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based." *Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, 138, 153 A.2d 477, 479 (1959). Accord: *Jones v. Treegoob, supra* 433 Pa. at 229, 249 A.2d at 354; *Warden v. Lyons Transportation Lines, Inc.*, 432 Pa. 495, 498, 248 A.2d 313, 314 (1968); *Flaherty v. Pennsylvania Railroad Company*, 426 Pa. 83, 85, 231 A.2d 179, 180 (1967); *Winkler v. Seven Springs Farm, Inc.*, 240 Pa.Super. 641, 646–647, 359 A.2d 440, 442 (1976), aff'd, 477 Pa. 445, 384 A.2d 241 (1978).

The evidence in this case was wholly insufficient upon which to base a logical conclusion that members of the hospital staff had been negligent in any identifiable way. A jury finding actionable negligence on the part of the hospital could base its verdict solely on speculation. Such a verdict cannot stand. The lower court en banc properly entered judgment n.o.v. for the hospital.

## II. DR. WALLACH'S MOTION FOR NEW TRIAL

In support of his motion for a new trial, Dr. Wallach argued in the court below that the trial court had committed error when it (1) sent out with the jury, over objection, the blackboard upon which Mrs. Reichman's attorney had computed damages during his closing argument; (2) received evidence, over objection, pertaining to Mrs. Reichman's being a survivor of the Holocaust; (3) permitted testimony, over objection, regarding the musical talents and accomplishments of Mrs. Reichman's daughter; and (4) permitted Mrs. Reichman to testify, over objection, that when she was in the recovery room she overheard Dr. Troncelliti say to an unidentified person that she was in critical condition and that Dr. Wallach had failed to respond to numerous messages regarding her condition.

The blackboard containing damage computations placed thereon by plaintiff's counsel during closing argument had not been received in evidence. However, it was allowed to go into the jury deliberating room upon the jury's request. Whether to allow such a request rests largely in the discretion of the trial judge, although it is better practice to caution the jury that it is not evidence and should not be considered as such by the jury. See and compare: *Phoenix Mutual Life Insurance Company v. Radcliffe on the Delaware, Inc.,* 439 Pa. 159, 169, 266 A.2d 698, 703 (1970); *Lancaster Redevelopment Authority Appeal,* 425 Pa. 36, 41–42, 227 A.2d 827, 831 (1967); *Solomon v. Luria,* 45 D. & C.2d 291, 297–298 (1967), *aff'd on the opinion below,* 213 Pa.Super. 87, 246 A.2d 435, (1968). Here, the information contained on the blackboard has not been preserved, and we

are unable to say that Dr. Wallach was prejudiced in any way thereby. Compare: *Johnson v. O'Leary,* 277 Pa.Super. 223, 230, 419 A.2d 742, 746 (1980), where we said: "It is the complaining party that has the duty to preserve the record, and, in this case, the appellant neglected to do so." (footnote omitted)

"Generally, it may be said that any legally competent evidence which, when taken alone or in connection with other evidence, tends to prove or disprove a material or controlling issue or to defeat the rights asserted by one or the other parties, and sheds any light upon or touches the issues in such a way as to enable the jury to draw a logical and reasonable inference with respect to the matter or principal fact in issue, is relevant. As thus defined, relevancy means the logical relation between the proposed evidence and a fact to be established." *Commonwealth v. Vukovich,* 301 Pa.Super. 111, 118, 447 A.2d 267, 270 (1982), quoting 29 Am.Jur.2d 302, 303, Evidence § 252. "The law furnishes no test of relevancy, but tacitly refers it to logic and general experience. Evidence is admissible which tends to make the fact at issue more or less probable or intelligible or to show the origin and history of the transaction between the parties and explain its character." *Gregg v. Fisher,* 377 Pa. 445, 454, 105 A.2d 105, 110 (1954). See also: *Commonwealth v. Duca,* 312 Pa. 101, 107, 165 A. 825, 827 (1933); *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885 (1912); *Whistler Sportswear, Inc. v. Rullo,* 289 Pa.Super. 230, 243, 433 A.2d 40, 47 (1981); *Catina v. Maree,* 272 Pa.Super. 247, 261, 415 A.2d 413, 420–421 (1979); Henry, Pennsylvania Evidence, p. 3. Much is left to the discretion of the trial judge. *Abbott v. Onopiuk (Steel City Piping Company),* 437 Pa. 412, 419, 263 A.2d 881, 884 (1970); *Catina v. Maree, supra* 272 Pa.Super. at 260, 415 A.2d at 419; *Lewis v. Mellor,* 259 Pa.Super. 509, 515, 393 A.2d 941, 944–945 (1978); *Radogna v. Hester,* 255 Pa.Super. 517, 520, 388 A.2d 1087, 1088 (1978); *Cartmel v. Williams,* 207 Pa.Super. 144, 147, 215 A.2d 282, 284 (1965); *Wolfe v. Pickell,* 204 Pa.Super. 541, 544, 205 A.2d 634, 635 (1964). "[T]he admission of irrelevant evidence is not always ground

for reversal. It becomes so only when its tendency is to draw the minds of the jury from the issue and to confuse, prejudice or mislead them." Henry, Pennsylvania Evidence, p. 4. See also: *Ickes v. Ickes, supra* 237 Pa. at 596, 85 A. at 889; *Whistler Sportswear, Inc. v. Rullo, supra* 289 Pa.Super. at 243, 433 A.2d at 47; *Albert v. Alter,* 252 Pa.Super. 203, 214–215, 381 A.2d 459, 465 (1977); *Simpson v. Robinson,* 238 Pa.Super. 555, 361 A.2d 387 (1976); *Kolb v. Hess,* 227 Pa.Super. 603, 610–611, 323 A.2d 217, 221–222 (1974); *D'Allura v. Perri,* 138 Pa.Super. 261, 264–265, 10 A.2d 124, 126–127 (1939).

■ We cannot say that the trial court erred in receiving evidence that Mrs. Reichman had survived the Holocaust. It was relevant, perhaps marginally, in view of the testimony that her ulcerative colitis had been caused by stress.

■ However, the evidence that her daughter had been a widely acclaimed child prodigy, held a master's degree from Julliard, and was an exceptionally talented person was clearly irrelevant. It neither proved nor disproved a legitimate issue pertaining to liability or damages. It included oral testimony that the daughter had written musical compositions at the age of three, had played benefit concerts with Rubenstein, had performed at the White House, and had been labeled a genius by several newspapers. Her talents were documented by newspaper articles, a photograph with the president, letters of praise by other musicians, and even some of the musical compositions she had written as a child. All were received in evidence over objection.

■ The lower court's opinion concedes that this evidence was irrelevant, but holds that the issue of its admissibility was not preserved for post-verdict review because counsel, after it had been received over objection, did not thereafter move to strike it. We disagree with this court imposed requirement. An objection to evidence distinctly made and overruled need not be repeated or renewed. 38 P.L.E. Trial § 81. See also: *Hill v. Gerheim,* 419 Pa. 349, 352–353, 214 A.2d 240, 243 (1965); *Hachick v. Kobelak,* 259 Pa.Super. 13,

17–18, 393 A.2d 692, 694 (1978); *Sentz v. Dixon,* 224 Pa.Super. 70, 74–76, 302 A.2d 434, 436–437 (1973); *Schwegel v. Goldberg,* 209 Pa.Super. 280, 286, 228 A.2d 405, 408 (1967).

A more difficult question is whether this irrelevant evidence, in the absence of other trial error, would require a new trial. Because there was additional, more compelling error, we find it unnecessary to decide this issue. Suffice it to say, that the evidence was irrelevant and should not have been received.

■ Mrs. Reichman was permitted to testify over objection that while she was lying in the recovery room, at or about 5:00 o'clock, P.M., she overheard Dr. Troncelliti yell into a telephone: "I have put five messages to Dr. Wallach's office. None of them returned. I have Mrs. Reichman in critical condition." The purpose of this testimony was explained in counsel's opening statement to the jury as follows: "Mrs. Reichman ... will tell you further that late in the evening the anesthesiologist was still trying to get ahold of Dr. Wallach. She was in critical condition. Suffice it to say she was taken out of the recovery room when it closed." The jury was never instructed to consider the evidence for any purpose other than as substantive evidence against Dr. Wallach.

This testimony was clearly hearsay. It was what Mrs. Reichman said that she had heard Dr. Troncelliti say. *Herr v. Erb,* 163 Pa.Super. 430, 435, 62 A.2d 75, 78 (1948). It was secondhand evidence, not proceeding from the personal knowledge of Mrs. Reichman. *Maglin v. Peoples City Bank,* 141 Pa.Super. 329, 334–335, 14 A.2d 827, 829 (1940). It was evidence of an extra-judicial utterance offered as evidence of the truth of the matter asserted. *Whitfield v. Reading Co.,* 380 Pa. 566, 570, 112 A.2d 113, 115 (1955); *Klischer v. Nationwide Life Insurance Company,* 281 Pa.Super. 292, 300, 422 A.2d 175, 179 (1980); *Wagner v. Wagner,* 158 Pa.Super. 93, 97, 43 A.2d 912, 914 (1945). It was not rendered admissible because Dr. Troncelliti was subsequently called as a defense witness and testified that he called Dr. Wallach's office only once on the afternoon of December 7. See and

compare: *Herr v. Erb, supra* 163 Pa.Super. at 433–434, 62 A.2d at 77; *Dreibilbis v. Esbenshade,* 6 Pa.Super. 182 (1897). Mrs. Reichman's argument to the contrary misperceives the nature of and reason for the hearsay exclusion. For a hearsay statement to be properly admitted in evidence, the proponent must be able to point to a hearsay rule exception which will justify the court in departing from the rule excluding extra-judicial statements. There must be brought before the tribunal passing on a dispute those persons who know of their own knowledge the facts to which they testify. *Johnson v. Peoples Cab Co.,* 386 Pa. 513, 514–515, 126 A.2d 720, 721 (1956).

Mrs. Reichman contends that Dr. Troncelliti's statement was either (1) an excited utterance or (2) a declaration of a present sense impression and, therefore, admissible under the res gestae exception to the hearsay rule. In the alternative, she argues that the erroneous receipt of this evidence was harmless. The excited utterance exception to the hearsay rule has been defined as "a spontaneous utterance by an individual whose mind has suddenly been made subject to an overpowering emotion caused by some unexpected and shocking act or occurrence. The utterance is generated by, or springs out of the act, and the words are in a sense part of the act itself. Hence, the exciting events actually speak through the 'verbal acts' of the declarant. The words, which are in the nature of this emotional impulsive outburst, must be in the same continuous transaction with the acts, thus they are in a sense integrated into the acts. The utterance must be near in time to the occurrence and to insure trustworthiness it normally must be spoken to one of the first persons seen by the declarant after the act. The basis for the admission of the utterance is its spontaneity, thus all utterances which do not display the mandated instinctive naturalness must be excluded for fear that the words will emanate in whole or in part from the declarant's reflective faculties. The declaration must be spoken under conditions which insure that it is not the result of premeditation, consideration or design, and it cannot be in the form of a

narration or attempted explanation of past events, thus the process of the intellect can not have had an opportunity to be set in motion." *Cody v. S.K.F. Industries, Inc.,* 447 Pa. 558, 563–564, 291 A.2d 772, 774–775 (1972) (footnote and citations omitted throughout). See also: *Commonwealth v. Penn,* 497 Pa. 232, 241, 439 A.2d 1154, 1159 (1982), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982); *Carney v. Pennsylvania Railroad Company,* 428 Pa. 489, 493–495, 240 A.2d 71, 73–75 (1968); *Haas v. Kasnot,* 371 Pa. 580, 583–584, 92 A.2d 171, 173 (1952); *Allen v. Mack,* 345 Pa. 407, 410, 28 A.2d 783, 784–785 (1942); *Carswell v. Southeastern Pennsylvania Transportation Authority,* 259 Pa.Super. 167, 177, 393 A.2d 770, 775 (1978); *Lininger v. Kromer,* 238 Pa.Super. 259, 267–270, 358 A.2d 89, 92–94 (1976); *Eller v. Work,* 233 Pa.Super. 186, 193 n. 2, 336 A.2d 645, 649 n. 2 (1975).

Dr. Troncelliti's declaration was not an excited utterance. It was not a spontaneous declaration made so near in time to an unexpected and shocking occurrence so overpowering as to make Dr. Troncelliti's declaration a product of his reflective faculties. His statement, as related by Mrs. Reichman, was a narrative of past events and contained an opinion regarding Mrs. Reichman's medical condition. In view of the fact that the declarant was a physician and the supervisor of the hospital recovery room, one searches in vain for the ingredients of an "excited utterance."

Similarly, the statement was not admissible as a present sense impression. This exception allows the receipt of a person's declarations concerning conditions or events which the declarant is observing at the time of his declaration. The rationale underlying this exception to the general rule is that the declarant will have no opportunity for reflection or calculated misstatement because his declaration has been *contemporaneous* with the occurrence of the event to which the declaration refers. It is "the reflex product of *immediate sensual* impressions, unaided by retrospective mental action." *Commonwealth v. Coleman,* 458 Pa. 112, 117, 326 A.2d 387, 389 (1974), quoting Morgan, Res Gestae, 12 Wash. L.Rev. at 96. (Emphasis supplied.) By definition, an utter-

ance is a present sense impression *only* if it is spoken contemporaneously with the event to which it refers. *Commonwealth v. Pronkoskie,* 477 Pa. 132, 137 n. 4, 383 A.2d 858, 860 n. 4 (1978); *Commonwealth v. Robinson,* 273 Pa.Super. 337, 341, 417 A.2d 677, 679 (1979). It is apparent from the contents of Dr. Troncelliti's alleged statement that (1) it was not spoken contemporaneously with the events to which it referred and (2) it was a product of retrospective mental action. Consequently, it was not admissible as a declaration of present sense impression.

It is argued finally that Dr. Troncelliti's statement would have been admissible in rebuttal to contradict his direct testimony that the only time he called Dr. Wallach was shortly before 1:00 o'clock, p.m., to inform him that Mrs. Reichman would be remaining in the recovery room and that, therefore, the receipt of the hearsay statement on plaintiff's side of the case was harmless error. This overlooks the fact that Mrs. Reichman not only offered the statement on her side of the case but offered it, as it was received, to show substantive negligence on the part of Dr. Wallach. If the anesthesiologist's statement had been admitted as a prior inconsistent statement to impeach his credibility, the jury would have been cautioned of the limited purpose for which it had been received and that it was not to be considered as substantive evidence. *Commonwealth v. Waller,* 498 Pa. 33, 39 n. 2, 444 A.2d 653, 656 n. 2 (1982); *Commonwealth v. Russell,* 456 Pa. 559, 565–566, 322 A.2d 127, 130–131 (1974); *Wilson v. Pennsylvania Railroad Company,* 421 Pa. 419, 431–432, 219 A.2d 666, 673 (1966); *Dincher v. Great Atlantic and Pacific Tea Co.,* 356 Pa. 151, 156, 51 A.2d 710, 713 (1947); *Commonwealth v. McGuire,* 302 Pa.Super. 226, 234, 448 A.2d 609, 613 (1982); *Westerman v. Stout,* 232 Pa.Super. 195, 202–203, 335 A.2d 741, 745 (1975); *Crawford v. Manhattan Life Insurance Company of New York,* 208 Pa.Super. 150, 162, 221 A.2d 877, 884 (1966).

A majority of the court en banc which heard the post verdict motions concluded that the admission of the hearsay statement had been error but that the error was harmless. We are unable to agree with the assessment of harmlessness.

Mrs. Reichman's evidence of negligence by Dr. Wallach was far from overwhelming. Indeed, the evidence of causation between the operative and post operative care which she received from Dr. Wallach and the subsequent finding of a seemingly unrelated disease was relatively weak. The improper hearsay statement attributed to Dr. Troncelliti injected into the case an unsupported opinion that Mrs. Reichman was in critical condition following performance of a hysterectomy.[2] Moreover, it implied, without evidence, that Dr. Wallach had willfully ignored the needs of a critically ill patient. There are not many aspects of medical misfeasance that will more quickly influence, perhaps prejudice, lay jurors than for a physician to ignore a patient. To be told that a physician has abandoned a critically ill patient and left her to her chances will persuade the most hardened juror against such an uncaring physician. Here, the only evidence that Dr. Wallach was uncaring and had ignored calls for help came into evidence by an improperly admitted hearsay statement. Thus it was not merely cumulative. Mrs. Reichman's evidence, as we have observed, was not overwhelming. *The introduction of this inadmissible and highly prejudicial hearsay statement under these circumstances was far from harmless.* In view of the close and vigorously contested nature of the liability issues, the balance may well have been tipped in favor of Mrs. Reichman by this improper evidence. See: *Carswell v. Southeastern Pennsylvania Transportation Authority, supra* 259 Pa.Super. at 182–183, 393 A.2d at 777–778; *Simpson v. Robinson, supra.*

The judgment n.o.v. in favor of The Pennsylvania Hospital is affirmed. The judgment entered in favor of Mara Reichman and against Edward E. Wallach is reversed, and the case is remanded for a new trial.

WICKERSHAM, J., files a concurring & dissenting statement.

**2.** Our review of the record has failed to turn up the same assessment of Mrs. Reichman's condition by any physician familiar with the case.

WICKERSHAM, Judge, concurring and dissenting:

I concur with the majority in concluding that the entry of judgment n.o.v. in favor of The Pennsylvania Hospital was correct.

I dissent from the award of a new trial and the reversal of the judgment entered in favor of Mara Reichman against Edward E. Wallach. Mrs. Reichman's testimony was, indeed, clearly hearsay ... but Dr. Troncelliti was examined and cross-examined at great length. The jury could not have been misled. The error was harmless under all the circumstances. I would affirm the jury verdict which followed a four-week trial.