643 A.2d 102

Jane RUSSELL

v.

ALBERT EINSTEIN MEDICAL CENTER,
NORTHERN DIVISION.

Jane RUSSELL, Administratrix of the Estate of
Joshua Alexander Russell, Deceased and
Jane Russell, in Her Own Right

v.

ALBERT EINSTEIN MEDICAL CENTER, NORTHERN
DIVISION, Soleiman Soli, M.D., Karen McCready,
M.D., Jeff Levine, M.D. and J.M. Payer, M.D.

Appeal of Soleiman SOLI, M.D.

Jane RUSSELL, Administratrix of the Estate of
Joshua Alexander Russell, Deceased and
Jane Russell, in Her Own Right

v.

ALBERT EINSTEIN MEDICAL CENTER, NORTHERN
DIVISION, Soleiman M. Soli, M.D., Karen McCready,
M.D., Jeff Levine, M.D., J.M. Payer, M.D.

Appeal of ALBERT EINSTEIN MEDICAL CENTER, Jeffrey
Levine, M.D., Jean Payer, M.D., and Karen McCready.

Superior Court of Pennsylvania.

Argued Jan. 26, 1994.

Filed April 22, 1994.

Reargument Denied June 24, 1994.

Howard M. Cyr, III and Dean F. Murtagh, Philadelphia, for Soli, appellant in No. 2905.

Charles A. Fitzpatrick, III, Philadelphia, for appellants in No. 2919.

Marc G. Brecher, Philadelphia, for Russell, appellee.

Before CAVANAUGH, TAMILIA and CERCONE, JJ.

TAMILIA, Judge:

This appeal is taken from the Judgment of August 3, 1993, entered following denial of appellants' motion for post-trial relief in the nature of a motion for judgment notwithstanding the verdict and/or a new trial. The underlying medical malpractice action was instituted by appellees, Jane Russell, administratrix of the estate of Joshua Russell, and Jane Russell in her own right, against appellants, Albert Einstein Medical Center, Northern Division ("AEMC"), Soleiman Soli, M.D., and Jeffrey Levine, M.D.[1] On October 5, 1986, at approximately 3:00 a.m., Jane Russell presented herself at AEMC in the early stages of labor. Ms. Russell was placed under the care of Dr. Levine, who, at the time, was a chief resident in obstetrics and gynecology at AEMC. Ms. Russell was taken to the labor room, and at 9:30 a.m. her amniotic membranes were ruptured as a means to accelerate labor and to facilitate placement of a fetal scalp monitor to measure fetal heart rate. At approximately 4:00 p.m., it was noted that Ms. Russell had a fever, as a result of suspected choriamnionitis, an infection of the membranes surrounding the fetus. To combat the suspected infection, a broad spectrum antibiotic was administered. Subsequently, Ms. Russell was moved to the delivery room, and at approximately 4:50 p.m. Dr. Levine attempted to effect a vaginal delivery by means of vacuum extraction and forceps. Sometime after 4:00 p.m., Dr. Soli, the attending physician on call, was telephoned at his home

1. The original complaint included as defendants Jean Prayer, M.D., and Caren McCrady, M.D. At the outset of the trial, it was determined and agreed to by all the parties that Drs. Prayer and McCrady were not liable and a Stipulation to Dismiss was filed of record, signed by counsel for the plaintiff, Albert Einstein Medical Center (also representing Drs. Levine, Prayer and McCrady) and Dr. Soli. This stipulation was with prejudice, signed by Judge Diaz and filed in the prothonotary's office on December 4, 1992. Dr. Prayer and Dr. McCrady did not participate in the trial, post-trial motions or appeal of this case. None of the remaining parties raised any issue on appeal concerning their dismissal. Drs. Prayer and McCrady, therefore, are excluded from any further action in this matter on remand. *See Rivera v. Philadelphia Theological Seminary*, 510 Pa. 1, 507 A.2d 1 (1986).

and apprised of the situation. Exactly when Dr. Soli was contacted and when he arrived at the hospital were disputed issues at trial. Dr. Soli and Dr. Levine consulted and decided to allow Ms. Russell's labor to proceed for a short time longer. Dr. Soli examined Ms. Russell at approximately 6:35 p.m., and then decided to perform a caesarean section in order to deliver the baby. The operation commenced at 7:16 p.m., and Joshua Russell was delivered at 7:33 p.m. Joshua Russell died at 4:04 p.m. on October 6, 1986, due to a streptococcal infection.

Trial was held from December 2, 1992 to December 9, 1992 before the Honorable Nelson A. Diaz and a jury in the Court of Common Pleas of Philadelphia County. Plaintiffs' case was based on the theory Joshua Russell died of a streptococcal infection due to defendants' failure to perform a timely caesarean section. On December 9, 1992, the jury returned a verdict against both defendants, apportioning negligence in the amount of 75 per cent to Dr. Levine and 25 per cent to Dr. Soli. The jury awarded damages in the amount of $605,000 for Joshua Russell's future lost earnings and $100,000 for pain and suffering.

On appeal, Dr. Levine raises various claims, all of which we find without merit. Inasmuch as the trial court ably addressed these issues, we would affirm the judgment against him on the basis of the trial court Opinion, however, as we are constrained to grant a new trial as to Dr. Soli, see *infra*, Dr. Levine also must stand retrial.

In his appeal, Dr. Soli argues the trial court erred in allowing appellee to read into evidence the deposition testimony of a non-party witness on the disputed issue of Dr. Soli's arrival at the hospital and in the delivery room, where the non-party witness, a nurse, was not proven to be unavailable. At trial, appellee read into evidence, over objections by Dr. Soli, excerpts from the deposition of nurse Kimberly Arrowsmith, wherein she stated that Dr. Soli first entered Ms. Russell's room at 6:35 on October 5, 1986. Nurse Arrowsmith's statement directly contradicted Dr. Soli's own testimony that he had gone to see Ms. Russell as soon as he arrived

at the hospital, approximately one-half hour earlier than the time noted by Nurse Arrowsmith.

■ The trial court allowed the deposition testimony to be admitted under Pa.R.C.P. 4020(a)(5), which states: "A deposition upon oral examination of a medical witness, other than a party, may be used at trial for any purpose whether or not the witness is available to testify." The trial court later stated:

> The underlying policy reason behind the rule is to minimize the time medical personnel must spend in a courtroom. The policy reasons which justify wanting to minimize the time physicians spend in a courtroom apply equally to nurses, as well as other medical personnel. The defendants' assertion to the contrary is without merit and lacks any foundation in logic. Clearly, had the legislature intended to limit Pa.R.Civ.P. 4020(a)(5) to apply only to physicians, the more broad term "medical witness" would not have been used.

(Slip Op., Diaz, J., 8/3/93, pp. 9–10.) We disagree with the trial court's holding and analysis of this issue.

Initially, we note the Pennsylvania Constitution vested in the Supreme Court "the power to prescribe general rules governing practice, procedure, and the conduct of all courts...." Pa. Const. Art. V, § 10(c). This constitutional provision is now implemented in the Judicial Code, 42 Pa.C.S. § 1722. Thus, the Rules of Civil Procedure are actually adopted and promulgated by the Supreme Court, rather than by the legislature.

■ In interpreting the ambiguity of Rule 4020's term "medical witness," we also note the following directive from the section of the Rules, **Rules of Construction:**

> (c) When the words of a rule are not explicit, the intention of the Supreme Court may be ascertained by considering, among other matters (1) the occasion and necessity for the rule; (2) the circumstances under which it was promulgated; (3) the mischief to be remedied; (4) the object to be attained; (5) the prior practice, if any, including other rules and Acts of Assembly upon the same or similar subjects; (6)

the consequences of a particular interpretation; (7) the contemporaneous history of the rule; and (8) the practice followed under the rule.

Pa.R.C.P. 127(c).

The Explanatory Note to Rule 4020 sets forth the rationale for the allowance of otherwise hearsay testimony of a non-party witness, irrespective of the witness' availability at trial. The Note states:

The rising costs of obtaining the testimony at trial of medical experts and the inconvenience which may be caused to the medical witness and to his patients, have suggested relaxation of the requirement that a medical witness who is available to testify must be produced at trial. The witness may have to appear a total of three times, first, at a deposition, second, at a compulsory arbitration hearing and third, at trial in the Common Pleas Court.

Videotape Rule 4017.1(g) recognizes this hardship by permitting use at trial of the videotape deposition of a medical witness even if he is available to appear. Rule 1809(b) similarly provides that on a de novo appeal to the Common Pleas Court from a Health Care Arbitration Panel the deposition of any medical witness offered during arbitration shall be admissable whether or not the witness is available at trial on the appeal.

. . . .

It is obvious that Rule 4020 is different from Rules 4017.1 and 1809(b). This Rule covers every kind of action at law or in equity. The types of experts and the nature of their testimony will be almost unlimited. These experts will have no "personal" problems *like the physician,* whose problems have been the justification for special treatment.

*Id.* (emphasis added).

Clearly, the language of the Explanatory Note to Rule 4020(a)(5) indicates it was designed primarily, if not exclusively, for physicians. Looking to the various factors enunciated in Rule 127(c), we find a reading of "medical witness" to

include other than physicians is unjustified, especially given consideration of factor (8), "the practice followed under the rule." Our review of the case law involving the application of Rule 4020(a)(5) discloses no instance in which the Rule was applied to anyone but a physician, and neither appellee nor the trial court has provided a case citation in support of their interpretation of the Rule.

Were this Court to extend Rule 4020(a)(5) to non-physician "medical witnesses," beginning with nurses, we can envision its utilization in myriad situations not intended by the Supreme Court. In the present case, for example, the Rule was invoked to allow for Nurse Arrowsmith's testimony regarding when Dr. Soli arrived to examine Ms. Russell, testimony not "medical" in nature. Under the trial court's interpretation of the Rule, any hospital support personnel with this knowledge would be viewed as "medical witnesses" and could have provided the same testimony, whether they were nurses, social workers or even custodial staff in the area. We find these persons are not "medical witnesses" within the ambit of Rule 4020(a)(5), and if such deposition testimony is to be admitted at trial, its basis must be other than Rule 4020(a)(5).

■ In support of his claim that the admission of Nurse Arrowsmith's deposition testimony prejudiced him, Dr. Soli relies upon *Reichman v. Wallach*, 306 Pa.Super. 177, 452 A.2d 501 (1982). In *Reichman*, plaintiff's medical malpractice action was based upon the alleged failure of physicians to treat promptly internal bleeding which followed the performance of a hysterectomy. In support of her claim, plaintiff was permitted to introduce a hearsay statement by a non-party witness in the operating room to the effect that defendant/physician ignored at least five telephone calls to his office requesting medical assistance for plaintiff. In awarding a new trial, the *Reichman* Court stated:

A majority of the court en banc which heard the post verdict motions concluded that the admission of the hearsay statement had been error but that the error was harmless. We are unable to agree with the assessment of harmlessness. Mrs. Reichman's evidence of negligence by Dr. Wal-

lach was far from overwhelming. Indeed, the evidence of causation between the operative and post operative care which she received from Dr. Wallach and the subsequent finding of a seemingly unrelated disease was relatively weak. The improper hearsay statement attributed to Dr. Troncelliti injected into the case an unsupported opinion that Mrs. Reichman was in critical condition following performance of a hysterectomy. Moreover, it implied, without evidence, that Dr. Wallach had willfully ignored the needs of a critically ill patient. There are not many aspects of medical misfeasance that will more quickly influence, perhaps prejudice, lay jurors than for a physician to ignore a patient. To be told that a physician has .abandoned a critically ill patient and left her to her chances will persuade the most hardened juror against such an uncaring physician. Here, the only evidence that Dr. Wallach was uncaring and had ignored calls for help came into evidence by an improperly admitted hearsay statement. Thus it was not merely cumulative. Mrs. Reichman's evidence, as we have observed, was not overwhelming. *The introduction of this inadmissible and highly prejudicial hearsay statement under these circumstances was far from harmless.* In view of the close and vigorously contested nature of the liability issues, the balance may well have been tipped in favor of Mrs. Reichman by this improper evidence.

*Id.* at 195–96, 452 A.2d at 511 (footnote omitted).

We find *Reichman* similar to the present case in several respects. Plaintiff and defendants both presented expert medical testimony asserting the presence and absence of defendants' liability, respectively, and plaintiff's evidence was not overwhelming. Further, the only testimony concerning Dr. Soli's alleged failure to see Ms. Russell as soon as he arrived at the hospital was that of Nurse Arrowsmith. Moreover, a great deal of plaintiff's expert opinion that Dr. Soli was negligent was based on the assumption that Dr. Soli arrived at the hospital at 6:08 p.m., but did not see Ms. Russell until 6:35 p.m.

For the foregoing reasons, we reverse the judgment in favor of appellee and remand the case for a new trial against AEMC and Drs. Soli and Levine. Pursuant to settled case law, a reversal as to one party requiring a retrial requires a remand and retrial as to all parties, whether or not they appealed and whether there were grounds for reversal as against one and not the others. *See Rivera v. Philadelphia Theological Seminary,* 510 Pa. 1, 507 A.2d 1 (1986) ("The grant of a new trial ordinarily 'means a new trial generally; it restores a case to the status it had before trial took place and is fully open to be tried *de novo* as to all parties and all issues.' *Mains v. Moore,* 189 Pa.Superior Ct. 430, 434, 150 A.2d 549, 551 (1959).") *Also see McKee by McKee v. Evans,* 380 Pa.Super. 120, 126 n. 1, 551 A.2d 260, 263 n. 1 (1988).[2]

Judgment reversed; case remanded for new trial.

Jurisdiction relinquished.

---

**2.** In light of our disposition of this case, we need not address Dr. Soli's remaining claims.